2004 VT 16

**In re Howard SINNOTT, Esq.**

[845 A.2d 373]

No. 03-170

¶ 1. February 12, 2004. This Court reviews, sua sponte, the Professional Responsibility Board Hearing Panel's conclusion that respondent violated Vermont Rules of Professional Conduct 1.5 by charging an unreasonable fee, and its recommendations that respondent be publicly reprimanded and ordered to personally make restitution. We affirm the panel's conclusion and accept its penalty recommendations.

¶ 2. Respondent is a licensed attorney in Vermont and New York. At all times relevant to this complaint he was the sole member of the Bennington law firm Daly & Sinnott Law Centers, PLLC, also known as The Law Centers for Consumer Protection. Respondent's practice consists almost exclusively of assisting clients reduce the amount of unsecured debt they owe to various creditors such as credit card companies. Respondent's firm enrolls clients in its debt reduction program. Under the program agreement, the firm makes automatic deductions from a client's bank account. The client funds accumulate in either the "office fees account" or the "creditor reserve account" until they reach a level that makes debt settlement negotiation viable.

¶ 3. New Jersey resident Juanita Gibbs turned to respondent's firm in November 2000 when she was facing collection of an $18,000 credit card debt owed to American Express. She called respondent's firm and spoke with Milton Smith, a customer service employee who completed a client intake and discussed Gibbs's financial situation, including her American Express debt, monthly income and expenses.

¶ 4. Shortly after Gibbs's phone conversation with Smith, she received a Legal Representation Agreement, a Notice of Representation, and a Credit Notification Letter. The Legal Representation Agreement that Gibbs signed authorized the firm to negotiate her American Express debt. It also authorized the firm to withdraw $300 per month from her bank account. The agreement provided that for the first four months the sum of $284 would be allocated to the monthly office fee, zero would be allocated to the creditor reserve fund (for debt settlement), and $16 would be charged for a monthly account maintenance fee. For the next thirteen months $142 would be allocated to the monthly office fee, $142 to the creditor reserve fund, and $16 to the monthly maintenance fee. Thereafter, for the next nineteen months $284 would be allocated to the creditor reserve and $16 to account maintenance.

¶ 5. The agreement also contained the following clause which is central to this proceeding:

I understand that the Law Center will necessarily incur administrative costs as a result of accepting me as a client, expenses as a result of negotiations with creditors, and it may incur costs for representing me in litigation, all of which would have been included in the 28% reduction of claims fees resulting from the completion of the Program. I agree that if I do not complete, the Law Center will have earned from office fee payments $500 a month in ad-

ministrative costs with a maximum of $1500 and $150/hr. in litigation costs, with a maximum of $1500 per case.

¶ 6. The panel found that respondent's firm completed a number of "routine" and automated tasks in the course of representing Gibbs. Most of these tasks consisted of mailing out form letters to Gibbs and her creditor and responding to Gibbs's occasional telephone inquiries as to the status of her case. On February 20, 2001, Gibbs called the firm and was told that the firm was negotiating on her behalf. On the next day, Gibbs received a summons from American Express related to her debt. In early March, she informed the firm in writing that she was withdrawing from the program and was requesting an explanation of the $500 monthly administrative costs called for in the fee agreement. The panel made no express finding as to the amount of hours that the firm spent on completing all of these tasks, but stated that it viewed respondent's estimate of between three and four hours of nonattorney time as "more than generous."

¶ 7. Five months after Gibbs's letter of withdrawal and request for refund, respondent replied with a letter of his own. He stated:

This letter accounts for your financial transactions with the Law Centers. Pursuant to your written retainer agreement, you made monthly payments for debt settlement and attorney's fees of $284.00. Before you discharged us as your attorneys, you in fact made four such payments, adding to a total of $1,136.00. You also agreed to pay a $16.00 per month account maintenance fee. You also explicitly agreed in the event of early discharge (i.e. before your debt could be settled) that you would be obligated to pay an administrative fee of $500.00 per month to be capped at a $1,500.00 total. Since you remained in the program for four months, we properly imposed this fee of $1,500.00, although we will not seek remuneration from you above and beyond the $1,136 paid by you to us.

The letter goes on to state that respondent would be glad to discuss the situation with Gibbs in an attempt to accommodate her concerns about the fee in light of her short tenure as a client.

¶ 8. When the four months worth of $16.00 monthly account maintenance fees are added to the other fees, respondent's firm had collected $1200 from Gibbs. Respondent testified that his firm would have been justified in charging the full $1500 termination fee called for by the agreement. Respondent also testified, and the panel found, that the "Fees Earned in Event of Termination" Clause contained in the Legal Representation Agreement that Gibbs signed was the only basis for the fee actually charged as well as respondent's claim of entitlement to the additional $300 which he could have, but chose not to charge Gibbs.

¶ 9. The panel heard testimony from respondent and his office manager that the firm does more work for those clients that have multiple creditors than it does for those clients like Gibbs, who sought help with only one of her debts. Respondent testified that it was not unusual for a client to withdraw from the program before the client's debts were negotiated. Nonetheless, the testimony and evidence indicated that respondent used the same fee agreement for almost all of his approximately 7000 clients regardless of whether they were in the program for years or just for a few months.

¶ 10. Based on the foregoing findings, the panel concluded that respondent had violated Vermont Rules of Professional Conduct 1.5 by charging an unreasonable

fee which it labeled as a "nonrefundable retainer." We review this case on our own motion pursuant to A.O. 9, Rule 11(E). On review, we will accept the panel's findings of fact unless a party demonstrates that these findings are clearly erroneous. *In re Blais*, 174 Vt. 628, 629, 817 A.2d 1266, 1269 (2002) (mem.). Similarly, the panel's findings, "whether purely factual or mixed law and fact, are upheld if they are 'clearly and reasonably supported by the evidence.'" *In re Anderson*, 171 Vt. 632, 634, 769 A.2d 1282, 1284 (2000) (mem.) (quoting *In re Berk*, 157 Vt. 524, 527, 602 A.2d 946, 947 (1991)). While we afford deference to the panel's recommendations, this Court renders the ultimate decision as to the sanction. *Blais*, 174 Vt. at 630, 817 A.2d at 1269.

¶ 11. The panel began its analysis by distinguishing nonrefundable retainers from general retainers, which are paid solely to ensure the availability of a lawyer for service to the client at any time. It described the former type of retainer as an advanced payment of fees that are not refundable in the event that the client terminates the relationship prematurely — even if the lawyer has not earned all or part of the fee yet. The panel noted that a client is entitled to discharge the attorney at any time with or without cause. It looked to decisions from other jurisdictions that involved similar fees and concluded that such fees were unethical because the possibility of forfeiting the advanced fee restrained a client's ability to terminate the relationship. While there may be valid comparisons between the fee agreement in this case and the fees charged in reported nonrefundable retainer cases from other jurisdictions, the classification of respondent's fee as a nonrefundable retainer is unnecessary to our decision. Accordingly, we do not adopt the panel's conclusion on this issue and reserve judgment for another case that presents the issue

squarely.[1] See *Graham v. Town of Duxbury*, 173 Vt. 498, 499, 787 A.2d 1229, 1232 (2001) (mem.) (this Court's review of conclusions of law is plenary and non-deferential); cf. *Gochey v. Bombardier, Inc.*, 153 Vt. 607, 613, 572 A.2d 921, 925 (1990) (Supreme Court "may affirm a correct judgment even though the grounds stated in support of it are erroneous.").

¶ 12. Distilling the panel's decision to its essence and excluding the extraneous discussion of nonrefundable retainers, we are persuaded that the panel's reasoning clearly and reasonably supports its conclusion that the respondent's fee was unreasonable. As the panel stated, "the key issue here is whether the attorney is providing services of value to the client for which the attorney is entitled to be paid or whether . . . the lawyer is charging the client for doing nothing." The panel concluded that the fee violates Vermont Rules of Professional Conduct 1.5 because it was charged without regard to whether the attorney performed any work for the client or whether services provided had any value to the client. In other words, the fee did not account for the "time and labor required," Vt. Rules of Prof'l Conduct 1.5(a)(1), or the "results obtained," Vt. Rules of Prof'l Conduct 1.5(a)(4).[2]

---

[1] Disciplinary counsel's complaint did not charge respondent with the use of a nonrefundable retainer. Neither disciplinary counsel nor respondent presented evidence or legal arguments on this issue before the panel. The panel raised this issue, sua sponte, for the first time in its decision. This issue has implications in Vermont beyond the resolution of this case, and we agree with both parties that it is too important to consider on appeal in a case that lacks adversary presentation on the issue.

[2] We take care to distinguish the use of fixed or flat fees for all-inclusive repre-

¶ 13. The clear and convincing evidence in the record supports the panel's conclusion that the fee calculation had nothing to do with work performed and that the work performed was of no value to the client. Respondent admitted that the fee was based solely on the terms of the representation agreement and not actual costs incurred representing Gibbs. Neither respondent nor anyone else at his firm reviewed Gibbs's file at the time of withdrawal to ascertain whether the charges were reasonable. Respondent could not even introduce any evidence that showed he historically incurred $500 per month in administrative costs per early-termination client. The panel found that Gibbs retained respondent solely for the purpose of negotiating her debt with American Express. The panel further found that respondent at no time initiated negotiations to settle Gibbs's debt with American Express, and not surprisingly, respondent did not otherwise obtain a reduction of Gibbs's debt. Nothing in the record indicates that any of the

_____

sentation. For example, some attorneys will charge a fixed amount to draft a will or represent a client in a divorce. In such instances, the fees are generally calculated based on the lawyer's historical assessment of the time and labor required in completing the task, as well as the standardized value delivered to the client when the results are obtained. See Vt. Rules of Prof'l Conduct 1.5(a)(1), (4), (8) (reasonableness of a fee may depend on time and labor required, the results obtained and whether the fee is fixed). While there may be specific instances where a lawyer charges unreasonable fixed fees for all-inclusive representation packages, this opinion should not be read to generally prohibit the use of such fee structures. The current case differs in that the attorney only assessed the charge in question when the client terminated the representation prior to the completion of the legal task.

"automated" or "routine" tasks completed in the three to four hours the firm spent working on Gibbs's behalf did anything to advance the goals of the representation or facilitate the disposition of her case. Ultimately, Gibbs negotiated a payment plan directly with American Express without any assistance from respondent or his firm.

¶ 14. Rule 1.5 commands that a lawyer's fee be "reasonable." Vt. Rules of Prof'l Conduct 1.5(a). A lawyer who charges an unreasonable fee in violation of Vermont Rules of Professional Conduct 1.5 commits misconduct, and is subject to discipline. See Vt. Rules of Prof'l Conduct 8.4(a) (violation of a Rule of Professional Conduct constitutes professional misconduct). Rule 1.5 enumerates eight factors to be considered in determining the reasonableness of a fee. It makes no sense to apply these factors, however, where, as here, the panel has found that the fee was calculated without regard to actual work performed, and was instead based only on a boilerplate agreement given to all clients.

¶ 15. Respondent argues that disciplinary counsel did not meet his burden of showing a violation by clear and convincing evidence because he did not produce evidence corresponding to each of the eight factors. For example, respondent alleges that disciplinary counsel should have produced expert testimony on what the prevailing legal rates in New Jersey were for the type of work Gibbs's case required because New Jersey, Gibbs's home jurisdiction, was the relevant locality. See Vt. Rules of Prof'l Conduct 1.5(a)(3) (reasonableness may depend on the fee customarily charged in the locality for similar work). Instead of being what respondent termed as a "particularly glaring" example of disciplinary counsel's failure to meet his burden, it is an illustration of the impracticality of examining all the rule factors in this case. The evidence shows that neither respondent nor any lawyer employed by him

performed any *legal* work in New Jersey. We, therefore, fail to see what light expert testimony[3] or other evidence on New Jersey legal rates could have shed on the panel's contemplation of this case.

---

[3] Without citation to authority, respondent asserts that

> [r]eported cases in which attorneys are adjudicated to have violated the professional responsibility rules by charging an unreasonable fee rely on expert testimony. Whether an expert testifies simply that the fee charged was unreasonable, or whether the expert offers an opinion of what should have reasonably been charged under the circumstances, the adjudicative body is not asked to speculate ... about the propriety of the fee.

While it may be true that there are reported professional responsibility cases that rely on expert testimony, we have not previously established that expert testimony is required to meet the burden of production to show a violation. We decline respondent's invitation to do so here. As in other areas of law, expert testimony may be used to assist the trier of fact determine a fact in issue or understand evidence that is outside the expertise or perception of the fact finder. See V.R.E. 702. The facts of this case were so straightforward that an expert would do little to enhance the panel's understanding of the case. Though this will not always be the case in professional responsibility cases generally, or in cases brought under Vermont Rules of Professional Conduct 1.5(a), it is all the more reason to allow the unique circumstances of each case to dictate the kind and quantum of evidence needed to show a violation. See Reporter's Notes, V.R.E. 702 (expert testimony is of "no greater probative weight" than other testimony and its necessity to sustain findings is determined by this Court on a case-by-case basis).

¶ 16. Respondent seeks to justify this fee on the theory that it was based on a valid contract that Gibbs freely and knowingly signed. This argument demonstrates respondent's failure to comprehend the effect of Vermont Rules of Professional Conduct 1.5(a); lawyers, unlike some other service professionals, cannot charge unreasonable fees even if they are able to find clients who will pay whatever a lawyer's contract demands.

¶ 17. Respondent argues vigorously that the panel violated his due process right to have fair notice of the charge against him by basing its decision on a finding that his agreement constituted the unethical use of a nonrefundable retainer — a charge that was not contained in the complaint against him. Our decision renders respondent's due process argument moot. Unlike the panel, we express no opinion as to whether the fee agreement was a nonrefundable retainer. We base our conclusion, that respondent violated Vermont Rules of Professional Conduct 1.5(a), on the case as presented by both sides and the facts as found by the panel — not on a legal theory that neither of the parties argued below or briefed on review.

¶ 18. Disciplinary counsel also charged respondent with violating Vermont Rules of Professional Conduct 1.15(b). By a two-to-one vote, the panel held that the rule did not apply to respondent's situation. The rule generally covers a lawyer's "safekeeping" duties with respect to funds or property that comes into the lawyer's possession but belongs to a client or third party. Vt. Rules of Prof'l Conduct 1.15(b). The first sentence of the relevant subsection states that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person." *Id.* This language implicates situations where an attorney receives property or funds from a source other than the client. The panel cited tort settlements or estate proceeds

as examples. The notification requirement would make no sense in the current context where a client has paid fees directly to the attorney from her own account and would presumably be aware of when and how much money he or she had paid to the attorney. While parts of the subsection, when read in isolation, may appear to cover fee situations, such a reading is inconsistent with the intent of Vermont Rules of Professional Conduct 1.15.

¶ 19. Both parties accept the panel's recommendation that we sanction respondent with public reprimand. In arriving at this sanction, the panel looked to American Bar Association Standards on Imposing Lawyer Sanctions § 7.3 (1991) (ABA Standards) which recommends public reprimand for lawyers who negligently engage in a single instance of conduct that amounts to a violation of the lawyer's professional duty. The panel also considered respondent's full and free disclosures to disciplinary counsel and his lack of prior disciplinary record as mitigating factors. See ABA Standards § 9.32(a), (e). We see no reason to impose a different or additional sanction. We trust, however, that if and when respondent returns to law practice, he will take care to see that his general fee structure comports with the views expressed in this opinion.[4]

¶ 20. The panel also recommended that respondent be ordered to personally pay restitution of the full $1200 in variously labeled fees he collected from Gibbs. Respondent agrees that Gibbs should receive any portion of the fee found to be excessive, but argues that he is entitled to an unspecified portion of the $1200 as quantum meruit compensation for the services his firm actually provided Gibbs. The panel noted that it had no evidence

on which it could determine what fee would have been reasonable in this case. Nonetheless, the panel concluded that the work respondent's firm performed for Gibbs did nothing to advance the sole goal of the representation: settling Gibbs's debt with American Express. We agree with the panel's apparent conclusion that respondent at no time performed any service of value to Gibbs and thus was not entitled to any remuneration.

¶ 21. The Court also agrees with the panel's recommendation that respondent personally make restitution to Gibbs. Respondent objects and argues that his firm, the Law Centers for Consumer Protection, should make restitution because Gibbs paid fees to the firm's accounts, and not to respondent's personal accounts. Respondent argues that the funds at issue are not covered by A.O. 9, Rule 8(A)(7) that provides for "[r]eimbursement of retainers, fees, trust funds, or other monies *collected or received* by the lawyer." (Emphasis added.) The panel correctly points out that it has jurisdiction over individual lawyers admitted to practice in Vermont, but lacks jurisdiction over the legal entities those lawyers create to facilitate their practice. The panel notes that it "would be the height of formalism to allow a lawyer to hide behind the use of a business entity to avoid his basic obligations." It would be highly inequitable for us to hold that the reimbursement sanction provided for in A.O. 9, Rule 8(A)(7) applies only to those lawyers who practice outside of the firm context, and not to the many lawyers who have, for whatever reason, organized their practice under some other entity like a legal corporation. As the board pointed out, the lawyer is in the best position to compel repayment from the legal entity. This is especially true in the present case because respondent is the sole member of his firm.

*Affirmed.*

---

[4] At oral argument respondent's counsel informed the Court that respondent has indefinitely suspended his law practice.