NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 8

No. 2018-112

In re Glenn Robinson, Esq.                                    Original Jurisdiction
(Office of Disciplinary Counsel)

                                                             Professional Responsibility Board

                                                             September Term, 2018

Sheila Ware, Chair

Sarah Katz, Disciplinary Counsel, Burlington, for Petitioner-Appellant.

P. Scott McGee of Hershenson, Carter, Scott & McGee, P.C., Norwich, for
  Respondent-Appellee.


PRESENT:  Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Pearson, Supr. J. (Ret.),
          Specially Assigned


         ¶ 1.   **PER CURIAM.**   A hearing panel of the Professional Responsibility Board concluded that respondent, Glenn Robinson, Esq., violated several of the Vermont Rules of Professional Conduct—Rules 1.7, 4.3, 8.4(d), and 8.4(g)—based on his relationships with two former clients. The panel imposed a sanction suspending respondent from the practice of law for two years and placed several conditions on respondent's ability to resume practice. This Court ordered review of the hearing panel's decision, pursuant to Administrative Order 9, designating the Office of Disciplinary Counsel as appellant. A.O. 9 § 11(E). Disciplinary counsel argues that the panel erred in applying the presumptive standards for attorney discipline and asks this Court

to modify the panel's sanction and disbar respondent. While accepting the recommended sanction, respondent argues that several of the panel's findings of fact were clearly erroneous, the panel incorrectly determined respondent acted knowingly in violating Rule 1.7, and the panel erred in concluding that respondent violated Rules 4.3, 8.4(d), and 8.4(g) and applying the standards for attorney discipline. We adopt the hearing panel's conclusions that respondent violated Rules 1.7, 4.3, and 8.4(g) of the Vermont Rules of Professional Conduct; reverse the panel's conclusion that respondent violated Rule 8.4(d); and conclude that respondent's actions warrant disbarment.

## I. Hearing Panel's Findings of Fact

¶ 2. The relevant facts as found by the hearing panel are as follows. Respondent was admitted to the Vermont bar and has practiced as a licensed attorney in Vermont since 1999. In 2005, respondent began business as a solo practitioner in Newport, Vermont. Most of respondent's practice related to family, criminal, and probate law. During the time period at issue, from December 2010 until approximately April 2013, respondent provided legal services for several female clients relevant to this appeal—C.M., P.B., and A.P. Respondent later employed and engaged in sexual behavior with these former clients. The hearing panel concluded that respondent violated the Rules of Professional Conduct based on his interactions with two of these individuals, C.M. and P.B. The hearing panel found no violations with related to respondent's conduct with A.P. On appeal, we address whether the panel correctly concluded that respondent's conduct with C.M. and P.B. violated the Rules of Professional Conduct and, if so, what sanctions are appropriate. We do not consider the allegations with respect to A.P.

## A. Respondent's Conduct with C.M.

¶ 3. Respondent represented C.M. in her divorce proceedings from December 2010 until June 2012. At the time, C.M. was a thirty-nine-year-old mother of five children who had

2

recently separated from her husband of sixteen years. She had left the family farm and was living in a trailer in Newport Center, Vermont. Respondent engaged in a sexual relationship with C.M. from February 2011 until June 2012, while he was representing her in the divorce action.

¶ 4. Prior to entering the sexual relationship with C.M., respondent discussed with C.M. whether he could ethically enter a sexual relationship with her while representing her in the divorce action, and he told her he believed he could do so. However, respondent did not request or receive a signed written waiver from C.M. acknowledging that she was aware of the risks of engaging in a sexual relationship with respondent while he represented her or authorizing him to do so. Respondent also took steps not to be seen with C.M. in the area of the state where he practiced.

¶ 5. During the pendency of the divorce action, C.M. was under considerable financial strain; she struggled to make her monthly car and rent payments. C.M. paid respondent an initial "retainer" of approximately $2000 by cashing in a retirement account, but she stopped making monthly payments to respondent at some point over the course of his representation of her in the divorce proceedings. To alleviate C.M.'s financial burden, respondent made several offers to C.M. that she could stay with him at his condominium and hired C.M. as an employee of a tanning salon business that he owned.

¶ 6. Respondent ended the relationship with C.M. very shortly after the final merits hearing in her divorce proceedings in June 2012. They had sexual relations on one occasion during the week following the divorce settlement and one final time in the fall of 2012. The panel found that C.M.:

> believes—rightly or wrongly—that [r]espondent failed to devote sufficient time to representing her interests in the divorce proceedings; that he did not take sufficient actions to protect and advance her financial interests in the proceeding; that he misled her

3

into agreeing to the final settlement; and that he abandoned her after convincing her to agree to a settlement in the divorce proceeding.[1]

The panel further noted that C.M. "felt that she was being abandoned by [r]espondent both personally and in connection with her expectations as to receiving ongoing support from [r]espondent on divorce-related issues going forward."

## B. Respondent's Conduct with P.B.

¶ 7. In December 2011, P.B. contacted respondent's office seeking legal advice. Respondent assisted her in connection with several matters, including a pending criminal proceeding in which respondent helped P.B. obtain temporary relief from the conditions of release imposed at her arraignment. He did not charge P.B. for his legal services. In January 2012, respondent contacted P.B. and offered her a job as an administrative assistant at his law firm. At the time, P.B. was twenty-nine years old, living with her parents, and aspiring to gain admission to a training program to work as a border-patrol agent. Because P.B. did not have a college degree, she needed to demonstrate law-related employment for a minimum of one year to qualify for admission to the training program—employment with respondent appealed to her to satisfy that requirement, and she had an incentive to remain employed with respondent for at least one year. P.B. had no experience or training as an administrative assistant.

¶ 8. P.B. suffers from mental-health issues. In 2005, P.B. was diagnosed with attention deficit hyperactivity disorder (ADHD) and post-traumatic stress disorder (PTSD). Over the course

---

[1] C.M. took an active role in the divorce proceedings and was concerned about obtaining a fair property settlement. The panel found that she justified entering into the settlement agreement, at least in part, based on her belief that the terms of the settlement could be adjusted in the future to be more favorable to her. C.M. asserted that respondent verbally assured her this was the case. The panel was unable to find by clear and convincing evidence that respondent made any unqualified communication along those lines; it found that C.M.'s understanding was more likely the product of a miscommunication. Either way, the panel found that, due to respondent's behavior, C.M. would likely never believe she received "zealous" representation from respondent and that his actions damaged her view of the legal profession.

of her treatment for these disorders, P.B. utilized a variety of coping mechanisms in response to exacerbation of her PTSD, which included, at times, self-harm via cutting behaviors, avoidance of social engagements, agoraphobia, withdrawal, and counterphobia—engaging in behavior that makes the individual feel threatened.

¶ 9.    P.B. began working for respondent in January 2012 and received her last paycheck in January 2013.  Over the course of her employment, P.B. experienced various difficulties relating to respondent.  Relevant to the panel's analysis and the issues on appeal are incidents where respondent tossed paperclips at P.B.'s cleavage, masturbated in her presence, and requested that she sign a contract in September 2012 indicating their relationship was "mutually welcome" and waiving any future claims against respondent.  The panel's findings regarding these events are as follows.

¶ 10.    The panel found that respondent encouraged a "relaxed atmosphere" at the office and often engaged in verbal banter, teasing, and flirtatious conduct with P.B.  In April or May 2012, respondent's common practice of "joking" with P.B. escalated when he—on more than one occasion—threw paperclips at her in a manner that intentionally "targeted her breasts and cleavage" so that the paperclips would slip down her shirt and between her breasts.  The panel found that, at various times throughout April and July 2012, P.B. told her psychiatrist "that her boss was making unwanted advances towards her or otherwise causing her stress."  The psychiatrist noted that P.B.'s PTSD symptoms "surfaced" and were "being exacerbated" due to the "unwanted sexual advances from [respondent]."

¶ 11.    The panel made further findings that, in late July 2012, while respondent and P.B. were together in the law office, an incident occurred during which, at respondent's request, P.B. unbuttoned her shirt, exposed her bra, and lowered her bra strap while respondent proceeded to

masturbate to ejaculation in his pants. Respondent asked her to pull on his tie while he masturbated; P.B. did so. That evening, after the incident, P.B. went home and "broke down" in front of her mother while explaining what had happened with respondent. On August 7, 2012, P.B. sent an email to respondent stating that she felt disrespected and planned to stop coming to work due to respondent's actions. Respondent replied that he never intended to make P.B. uncomfortable and that he would be happy to speak with her about her concerns. Following this exchange, P.B. and respondent revisited signing a contract to outline the boundaries of their personal and professional relationships—an issue that had been developing for several months.

¶ 12.    The panel made the following findings regarding the contract agreement between P.B. and respondent. In May or early June 2012, respondent told his step-father about his interest in pursuing a romantic relationship with P.B. and was encouraged to "get something in writing" indicating that the relationship was consensual. Soon thereafter, respondent and P.B. participated in a conference call with respondent's step-brother, who is also an attorney. During the call, respondent asked his step-brother to draft an agreement reflecting that the relationship was "mutual and welcoming" and containing a release of any sexual-harassment or gender-discrimination claim, preventing P.B. from alleging either claim in the future. Respondent's step-brother drafted the agreement entitled "Notice of Intent to Engage in Mutually Welcomed Romantic Relationship and Waiver of Claims" and provided it to respondent, who gave a copy of the agreement to P.B. Notably, the contract provided a waiver by P.B. of "any and all" state and federal law claims of sexual harassment or gender discrimination against respondent—apparently including future as well as past claims. The panel found that P.B. "was confused and intimidated by the conference call, had a hard time following the discussion and understanding the issues, and did not understand the need for a written agreement." Neither party signed the agreement at this point; no further

6

action was taken regarding the agreement until the fall of 2012, following the masturbation incident.

¶ 13. After the masturbation incident and email exchange between respondent and P.B., respondent asked his step-brother to revise the contract. In September 2012, respondent and P.B. discussed and signed the contract. No witnesses were present, and P.B. did not have an attorney. The panel found that P.B. "believed from her discussion with respondent that they needed to sign the agreement to satisfy [r]espondent's father and that it was required of her to continue working for [r]espondent." The panel further found that "[r]espondent did not advise [P.B.] to obtain independent legal advice with respect to the agreement."

¶ 14. Other relevant facts found by the panel regarding the relationship between respondent and P.B. include the following. At some point during the fall of 2012, respondent began counseling, which P.B. perceived to have a positive effect on respondent. In December 2012 or January 2013, respondent began to indicate that he was displeased with P.B.'s absences from work due to her agoraphobia and informed her that he wanted to hire another former client, A.P., as his new assistant and to have P.B. help train her for the position. P.B. and respondent were still engaged in a sexual relationship at this point. In January 2013, P.B. ceased working for respondent—it is unclear whether P.B. quit or she was fired—and A.P. began working in his office. From the time P.B. stopped working with respondent in January 2013 until the panel's hearing, P.B. was unemployed, lived at home with her parents, and continued to suffer from agoraphobia and other symptoms related to her PTSD and ADHD conditions. In the spring of 2013, P.B. sought legal help from an attorney regarding respondent's behavior toward her, but she did not initiate a claim against respondent.

7

¶ 15.    In May 2013, P.B. was interviewed by a state police officer because of a complaint of sexual harassment filed against respondent by A.P.  This complaint ultimately led to the disciplinary hearing at issue here.  When interviewed, P.B. made allegations of sexual harassment against respondent.  Although the relationship between P.B. and respondent was complicated, and the parties gave conflicting testimony, the hearing panel ultimately found that respondent's sexual attentions toward P.B. involving the paperclip incident and the masturbation incident were "unwanted" by P.B. and caused her harm.[2]

## II.  Disciplinary Proceedings

¶ 16.    As noted above, in April 2013, A.P. filed a sexual-harassment claim against respondent.  This claim triggered an investigation into respondent's behavior with C.M., P.B., and A.P. and led to the disciplinary hearing at issue here.

¶ 17.    Following the investigation, no criminal charges were filed against respondent, and the matter was referred to the Professional Responsibility Program in 2013.  The panel held a hearing over a five-day period in November 2017 and January 2018.[3]  In March 2018, the panel

---

[2]    The panel made additional findings indicating that P.B. and respondent reconciled and continued their sexual relationship intermittently until December 2014.  The panel heard testimony that, among other allegations, "[a]t various times subsequent to the termination of [P.B.]'s employment, [P.B.] expressed to her parents and others that she was afraid of [r]espondent" and that respondent had made threats against her to prevent her from testifying.  The panel found that "[t]here was no evidence presented that [r]espondent threatened [P.B.] at any time," and explained that, according to P.B.'s therapist, these reported incidents were "consistent with the behavioral profile associated with PTSD during periods of exacerbation."  Respondent seeks to discredit P.B.'s allegations of harassment and harm resulting from respondent's actions due to her inconsistency.  While we acknowledge that the record indicates discrepancies in P.B.'s state of mind toward respondent, we determine that the panel's findings of fact were not clearly erroneous and agree with the panel's conclusion that, based on the findings, it is reasonable to determine that respondent knowingly engaged in conduct that was "unwelcome" by P.B.

[3]    The panel acknowledged that there was a delay in proceedings due, in part, to respondent's "effort to secure a ruling on the basis of a stipulation of facts" and the appointment of a new hearing panel.

8

issued an order setting forth the findings of fact, conclusions of law, and sanctions. Based on the facts outlined above, the panel concluded that respondent violated Rules 1.7, 4.3, 8.4(d), and 8.4(g) due to his misconduct with C.M. and P.B.[4] The panel further determined that respondent acted "knowingly" regarding each violation; that each of the violations resulted in harm (potential or actual) to C.M., P.B., or the public's perception of the legal profession; and that the presumptive sanction for each violation should be suspension. The panel's consideration of the aggravating and mitigating factors did not alter the presumptive sanction, and the panel ultimately suspended respondent from the practice of law for two years. The panel also ordered:

> In the event that [r]espondent files a motion seeking permission to resume the practice of law, . . . he shall be required to submit as part of his application (1) an independent . . . evaluation of his mental health . . . to be performed no earlier than 90 days prior to the filing of any motion; and (2) a certificate of his participation in and completion of a sexual harassment education program that meets with the prior approval of Bar Counsel.

¶ 18. On appeal, disciplinary counsel asks this Court to adopt the factual findings and conclusions of law as set forth in the hearing panel's order, but to modify the sanction and disbar respondent from the practice of law. Respondent does not contest the imposition of a two-year suspension but challenges several of the hearing panel's findings.

---

[4] The panel determined that there was insufficient evidence to conclude that respondent's sexual interactions with A.P. were "unwelcome." As such, the panel did not find that respondent violated any of the Vermont Rules of Professional Conduct based on his relationship with A.P.

We note that Rule 1.8 was recently amended, effective March 12, 2018, to expressly prohibit a lawyer from having sexual relationships with a client, subject to a limited exception: "A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced." V.R.Pr.C. 1.8(j) (2018). However, this change to Rule 1.8 postdated the Rules of Professional Conduct in effect at the time of the events alleged and is therefore inapplicable to this proceeding.

III. Standard of Review

¶ 19.     We review "a disciplinary hearing panel's findings of fact under a clearly erroneous standard." In re Strouse, 2011 VT 77, ¶ 8, 190 Vt. 170, 34 A.3d 329 (per curiam). We will uphold the panel's findings "if clearly and reasonably supported by the evidence, whether the findings are purely factual or mixed law and fact." Id. (quotation omitted). We review the panel's legal conclusions, including its violations determinations, de novo. See In re Sinnott, 2004 VT 16, ¶ 11, 176 Vt. 596, 845 A.2d 373 (mem.) (citing Graham v. Town of Duxbury, 173 Vt. 498, 499, 787 A.2d 1229, 1232 (2001) (mem.) for proposition that "this Court's review of conclusions of law is plenary and nondeferential"). Our standard of review regarding the level of deference we afford the panel's sanction recommendation has been unclear; we clarify that standard here.

¶ 20.     In the past, we have stated that the Court defers to the disciplinary panel's recommendations on the issue of sanctions, yet retains discretion to determine which sanctions are appropriate for violations of the Rules of Professional Conduct. Strouse, 2011 VT 77, ¶ 8 ("We give deference to the recommendations of a disciplinary panel but use our own discretion and make our own determinations as to which sanctions are appropriate for violations of the Rules of Professional Conduct."); see also In re Fink, 2011 VT 42, ¶ 16, 189 Vt. 470, 22 A.3d 461 ("As to sanctions, we accord the panel's recommendation deference, but this Court renders the ultimate decision." (quotation omitted)). This standard is contradictory—it suggests that we simultaneously defer and, yet, do not defer to the disciplinary panel's exercise of discretion. As explained below, there is no basis for this Court to defer to the panel's sanction recommendation. To the extent that our caselaw has indicated such deference is appropriate, we reject that proposition now.

¶ 21.     Under the Vermont Constitution, the Supreme Court exercises "administrative control of all the courts of the state, and disciplinary authority concerning all judicial officers and

10

attorneys at law in the State." Vt. Const. ch. II, § 30. Pursuant to that authority, this Court has promulgated the Vermont Rules of Professional Conduct, setting forth the ethical rules and responsibilities governing attorneys in the State, and has established a program to enforce the Rules of Professional Conduct and provide for attorney discipline, known as the Permanent Rules Governing Establishment and Operation of the Professional Responsibility Program, which are set forth in Administrative Order 9. The disciplinary program is administered by the Professional Responsibility Board. Notably, "the [Board] acts on behalf of this Court and pursuant to rules adopted by this Court." In re Berk, 157 Vt. 524, 527, 602 A.2d 946, 948 (1991) (per curiam); see A.O. 9 Preamble to Permanent Rules (explaining Board was created by this Court pursuant to its "constitutional authority. . . to structure and administer the lawyer discipline and disability system"). However, "[t]his Court retains inherent power to dispose of individual cases of lawyer discipline." Berk, 157 Vt. at 527, 602 A.2d at 948 (quotation and alteration omitted); see also Vt. Const. ch. II, § 30 (stating Supreme Court has "disciplinary authority concerning all . . . attorneys at law in the State"). Decisions by hearing panels of the Board are appealable to this Court under Rule 11(E) of the Permanent Rules. Although these decisions come to this Court on appeal, we have stated that "this Court does not 'review' [Board] recommendations on sanctions; rather, it makes its own ultimate decisions on discipline." Berk, 157 Vt. at 527-28, 602 A.2d at 948. While the rules provide that the Board's findings of fact "shall not be set aside unless clearly erroneous," A.O. 9 § 11(D), the rules do not provide standards of review for the Board's conclusions in mixed findings of fact and law or its recommendations on sanctions. As such, the rules provide no basis for this Court's deference to the Board's sanction recommendations.

¶ 22. When this Court gives deference to another body's decisions, such as in the context of deference to agency determinations within the agency's area of expertise, such

11

"[d]ecisions . . . are presumed correct, valid, and reasonable." In re Korrow Real Estate, LLC Act 250 Permit Amendment Application, 2018 VT 39, ¶ 21, __ Vt. __, 187 A.3d 1125. We apply this deferential standard in limited circumstances. Id. ¶ 20 (explaining that this Court "owes deference to agency interpretations of policy or terms when: (1) that agency is statutorily authorized to provide such guidance; (2) complex methodologies are applied; or (3) such decisions are within the agency's 'area of expertise' "). Even then, such deference is limited—we do not defer to a legal conclusion or interpretation of law if it is unreasonable, irrational, arbitrary, or capricious because it would violate due process principles. Id. Importantly, "where we are not reviewing a decision by an agency charged with promulgating and interpreting its own rules, we employ the familiar de novo standard of review for matters of law." In re Confluence Behavioral Health, LLC, 2017 VT 112, ¶ 12, __ Vt. __, 180 A.3d 867 (quotation omitted).

¶ 23. Here, the Board is not akin to an agency. First, this Court, not the Legislature, tasked the Board with administering the disciplinary program. As such, there is no separation of powers concern that would invite this Court's deference to the Board. Cf. Town of Victory v. State, 2004 VT 110, ¶ 16, 177 Vt. 383, 865 A.2d 373 ("To preserve the appropriate separation of judicial and executive powers, we presume that judicial review of administrative decisions is deferential absent a clear [legislative] statement of contrary intent.") Second, this Court, not the Board, promulgated the Rules of Professional Conduct. Therefore the Court, not the Board, is uniquely positioned to interpret and administer its own rules—again, deference to the Board is not the standard here. See Confluence Behavioral Health, LLC, 2017 VT 112, ¶ 12 (explaining that we apply de novo standard of review when reviewing matters of law not within agency's charge, such as interpreting its own promulgated rules).

¶ 24. As we have repeatedly affirmed, "it is upon this Court that the responsibility for regulation and discipline of the legal profession falls." In re Harrington, 134 Vt. 549, 552, 367 A.2d 161, 163 (1976) (per curiam) (citing Vt. Const. ch. II, § 30). In Harrington, we explained:

> [T]his Court is the true final arbiter in [a disciplinary] matter. It is not the function of this Court . . . to "review" actions taken below. The only final and ultimate decision is made here, on the responsibility of this Court. The Professional Conduct Board functions as a collator of the facts and an advisor to the Court, assembling and evaluating the presented material so that it will be in manageable form for the Court. The findings and recommendations of the Board, both as an arm of the Court and as a body representation of the profession, carry great weight. But they are not binding.

Id. (emphases added). While we have long recognized the Board's role as an advisor, giving "great weight" to their recommendations, id., the application of deference to a disciplinary hearing panel's recommendation seems to have appeared in this Court's decision in Berk, 157 Vt. at 527-28, 602 A.2d at 947-48. The Berk Court used "deference" as a synonym for "great weight," noting that other courts applied a similar standard. Id. However, the cases cited by the Court show that courts in other states at the time gave "great weight"—not "deference"—to Board recommendations. See Hawkins v. State Bar, 591 P.2d 524, 526 (Cal. 1979) (en banc) ("[W]e note that despite our undoubted power of review of disciplinary matters, the disciplinary board's recommendation is given great weight . . . ."); In re Discipline of Gubbins, 380 N.W.2d 810, 812 (Minn. 1986) (per curiam) (referring to board as "referee" when stating "[w]hile we alone are responsible for determining appropriate discipline, we place 'great weight' on the referee's recommendations"); In re Kushner, 502 A.2d 32, 35 (N.J. 1986) (per curiam) (explaining court gave "great weight" to board recommendations but would "not hesitate to impose a more severe sanction than that recommended by the Board when circumstances warrant"). We note that contemporary courts similarly give weight to panel conclusions and recommended sanctions, but

13

do not give them deference. In re Wyatt's Case, 982 A.2d 396, 406 (N.H. 2009) (deferring to board's "factual findings if supported by the record, but retain[ing] ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction"); In re Richmond's Case, 872 A.2d 1023, 1028 (N.H. 2005) ("We review the referee's factual findings to determine whether a reasonable person could reach the same conclusion as the referee based upon the evidence presented. However, we review de novo to determine whether the referee committed errors of law." (citation omitted)); In re Disciplinary Proceeding Against Eugster, 209 P.3d 435, 444 (Wash. 2009) (en banc) ("This court bears the ultimate responsibility for lawyer discipline . . . . We give considerable weight to the hearing officer's findings of fact, especially with regard to the credibility of the witnesses, and we will uphold those findings so long as they are supported by substantial evidence. We give great weight to a hearing officer's determination of an attorney's state of mind because it is a factual finding. However, we review a hearing officer's conclusions of law de novo." (quotations omitted)).

¶ 25.    Giving "great weight" to an advisor's recommendation, Harrington, 134 Vt. at 552, 367 A.2d at 163, is distinct from "presum[ing]" that decisions made by a disciplinary hearing panel are "correct, valid, and reasonable." Korrow, 2018 VT 39, ¶ 21. Therefore, we determine that the "great weight" afforded to panel recommendations is more appropriately characterized as giving consideration to the panel in light of this Court's role as plenary authority, rather than giving the panel "deference" as that term is used in our broader caselaw.

¶ 26.    Our disciplinary-hearing caselaw supports this version of our standard. This Court has routinely conducted its own legal analysis of the issues present and reached its own conclusions regarding the violations and appropriate sanctions in a given matter. See, e.g., Strouse, 2011 VT 77, ¶ 9 (agreeing with panel's conclusion regarding violation of Rule 8.4(c) but applying alternate

sanction); <u>Fink</u>, 2011 VT 42, ¶ 16 (reciting deference standard but conducting independent review to determine whether evidence was sufficient to prove violation); <u>Sinnott</u>, 2004 VT 16, ¶¶ 10-11 (conducting independent analysis of legal issues but ultimately finding panel's reasoning persuasive and agreeing with panel's recommendations). This practice is consistent with a de novo standard and our role as the ultimate authority for attorney discipline.

¶ 27. Thus, the standard of review that we will apply upon review of a disciplinary proceeding will be as follows: we review the panel's findings of fact for clear error and review de novo its conclusions of law, including the panel's violation determinations and sanction recommendations. In doing so, we will give consideration to the panel's sanction recommendation, but we will treat it as just that—a recommendation. If our analysis comports with the recommendation of the panel, we will affirm it; if it does not, we will exercise our plenary authority to reach the appropriate conclusions and sanctions.

IV. Contested Findings of Fact

¶ 28. We first review the panel's findings of fact, which respondent contests. As explained above, we will defer to the panel's findings so long as they are "clearly and reasonably supported by the evidence." <u>Strouse</u>, 2011 VT 77, ¶ 8 (quotation omitted). Here, the panel conducted a five-day hearing riddled with contradictory testimony and competing narratives.

¶ 29. First, respondent contends that this Court should apply his version of certain essential facts to its analysis. Most notably, respondent asserts that the panel's findings regarding: (1) the details of the paperclip incident, (2) whether respondent's sexual conduct was "unwelcome" by P.B. during the paperclip and masturbation incidents, and (3) whether P.B.'s mental-health conditions were "exacerbated" by her relationship with respondent and his conduct were clearly erroneous. In support of this argument, respondent attacks P.B's credibility because "[P.B.'s]

15

testimony was contradicted on material points by undisputed evidence" and "[P.B.] was mentally unstable." Our deference to the panel's factual findings clearly extends to the panel's credibility determinations—the credibility of witnesses and resolution of disputed or contradictory testimony is for the finder of fact. See In re Elgin, 918 A.2d 362, 373 (D.C. Cir. 2007) (explaining that court defers to findings of fact and credibility determinations made by Board of Professional Responsibility). We conclude that the panel's findings on all three issues are supported by the evidence—including P.B.'s testimony, her psychiatrist's testimony and records, and her mother's testimony regarding P.B.'s description of the masturbation incident and her deteriorating enthusiasm for working at respondent's office—and that the panel's findings were not in error.

¶ 30. Next, respondent contests two specific findings by the panel: (1) that "[r]espondent presented no evidence that he ever provided [C.M.] with a description of the types of risks" associated with respondent representing her in her divorce proceedings while the two were engaged in a sexual relationship; and (2) that P.B. believed she needed to sign the September 2012 agreement to continue working for respondent or else she would be fired.

¶ 31. Regarding the first assertion, we agree with respondent that the panel's finding disregards respondent's testimony that he verbally discussed the potential risks of engaging in a sexual relationship with C.M. It is unclear whether the panel overlooked this testimony or whether it found the statement unpersuasive. However, the panel's error on this point is harmless. The panel's ultimate conclusion that respondent violated Rule 1.7 was based on its finding that C.M. did not give informed consent, confirmed in writing, waiving the conflict, as required by the Rule. Although respondent contends that he provided C.M. with verbal disclosures, respondent does not contest the finding that he did not secure written confirmation of C.M.'s informed consent; the panel's factual error, if error at all, does not impact its conclusion that respondent violated Rule 1.7.

16

¶ 32. Second, respondent argues that the evidence does not support the finding that P.B. believed she would be fired if she did not sign the September 2012 agreement. At the hearing, P.B. explained that she believed she and respondent would be "in trouble" if they did not sign the agreement before respondent's step-father came to the office, but there is no direct evidence that P.B. believed she would be fired if she did not sign. However, the panel explained that, even if P.B. "voluntarily signed the agreement because she wanted to have a consensual relationship with [r]espondent," respondent still engaged in quid pro quo sexual harassment merely by presenting and entering into the agreement. The panel articulated that "[a]lthough the waiver provision did not <u>explicitly</u> make the submission to unwanted sexual advances a term of employment, it <u>implicitly</u> did so by placing [P.B.] in a position where she could not as a practical matter assert a claim of discrimination or harassment against her employer going forward." Thus, any error in the panel's findings regarding P.B.'s motive in signing the contract does not impact the panel's conclusion that respondent violated Rule 8.4(g).

## V. Contested Conclusions of Law

¶ 33. Next, we address whether respondent violated Rules 1.7, 4.3, 8.4(d), and 8.4(g) based on his conduct with C.M. and P.B. and the presumptive sanctions that should correlate with each violation. The American Bar Association's Standards for Imposing Lawyer Sanctions guide our sanctions determinations. <u>Fink</u>, 2011 VT 42, ¶ 35; Ctr. for Prof'l Responsibility, Am. Bar Assoc., <u>Standards for Imposing Lawyer Sanctions</u> (1986) (amended 1992) [hereinafter ABA Standards]. "Under this construct, we consider: '(a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.' " <u>Fink</u>, 2011 VT 42, ¶ 35 (quoting ABA Standards § 3.0). The standards provide a presumptive sanction "[d]epending on the importance of the duty violated, the

level of the attorney's culpability, and the extent of the harm caused." Id. However, the presumptive sanction may be altered "depending on the existence of aggravating or mitigating factors." Id. Notably, "the purpose of sanctions is not to punish attorneys, but rather to protect the public from harm and to maintain confidence in our legal institutions by deterring future misconduct." Id. (quotation omitted). In this case, we concur with the panel's conclusions regarding respondent's violations of Rules 1.7, 4.3, and 8.4(g) and the corresponding presumptive sanction assigned by the panel regarding the violation of Rule 1.7. However, we disagree with the panel's sua sponte conclusion that respondent violated Rule 8.4(d). We also disagree with the panel's determination that the presumptive sanction for respondent's violations of Rules 4.3 and 8.4(g) should be suspension; we conclude that disbarment is the presumptive sanction for respondent's violations of these rules. We consider each violation and sanction determination in turn.

## A. Rule 1.7 (Conflict of Interest: Current Clients)

¶ 34. First, we consider whether respondent violated Rule 1.7 by engaging in a sexual relationship with C.M. while representing her in her divorce proceedings and failing to obtain her consent to the representation in writing. Rule 1.7 prohibits an attorney from representing a client where there is a concurrent conflict of interest. Specifically, the Rule provides, "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." V.R.Pr.C. 1.7(a). Rule 1.7 provides for limited exceptions:

> Notwithstanding the existence of a concurrent conflict of interest . . . a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; <u>and</u>

(4) <u>each affected client gives informed consent, confirmed in writing</u>.

Rule 1.7(b) (emphasis added). Here, the panel determined that respondent violated his duty to avoid conflicts of interest, and did not qualify for an exception, under Rule 1.7 when he engaged in a sexual relationship with his client, C.M., without obtaining her "informed consent" in writing. Based on the facts found by the panel, we agree that respondent violated Rule 1.7.

¶ 35. Next, we must determine respondent's mental state in committing the violation. "The lawyer's mental state may be one of intent, knowledge, or negligence." ABA Standards § 3.0, cmt. The standards define these mental states as follows. Intent, the most culpable mental state, is defined as acting with "the conscious objective or purpose to accomplish a particular result." ABA Standards, Definitions. Knowledge, the next most culpable mental state, is "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." <u>Id</u>. Finally, negligence, the least culpable mental state, exists when a lawyer fails "to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." <u>Id</u>.

¶ 36. In <u>Fink</u>, we explained that the distinction between negligent and knowing conduct

is whether a lawyer had a conscious awareness of the conduct underlying the violation or whether he failed to heed a substantial risk that a violation would result from his conduct. In other words, was the lawyer aware of the circumstances that formed the basis for

19

> the violation? If so, the conduct was done knowingly. If the lawyer instead acted without awareness, but below the accepted standard of care, then he acted negligently.

2011 VT 42, ¶ 38. Notably, "[a]pplication of these definitions is fact-dependent," and as such "we give deference to the panel's assessment of an attorney's mental state." Id.

¶ 37. Regarding respondent's mental state in this case, the panel concluded that respondent knowingly violated Rule 1.7 because he "<u>knowingly</u> entered into a sexual relationship with [C.M.] while he was representing her in the divorce action." (Emphasis added.) Respondent argues that, while "his judgment was mistaken, . . . his failure to recognize a significant risk of conflict was negligent, not knowing" when he reviewed comment 17 of the Rules of Professional Conduct with C.M. and believed he could avoid a conflict. However, the panel concluded that respondent did not act negligently because his failure to conduct adequate legal research on conflicts of interest did not diminish his state of mind. We agree with the panel's conclusion.

¶ 38. Next, the ABA Standards ask us to consider "the actual or potential injury caused by the lawyer's misconduct." ABA Standards § 3.0(c). Under the ABA Standards, injury is defined as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct. The level of injury can range from 'serious' injury to 'little or no' injury." ABA Standards, Definitions. "Potential injury" refers to harm "that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." Id. "The extent of the injury is defined by the type of duty violated and the extent of the actual or potential harm." Id., Theoretical Framework.

¶ 39. Here, the panel concluded that, although there is no evidence that C.M. suffered actual harm from respondent's representation in her divorce proceedings, respondent's actions presented a "serious potential injury" to C.M. by placing her at risk of conflicted representation

20

and resulted in a "serious actual injury to the public perception of the legal profession."  Again, we agree with the panel; a conflict-of-interest violation of this type "feed[s] public distrust of lawyers and decrease[s] public confidence in the profession."  Fink, 2011 VT 42, ¶ 36 (finding respondent caused "injury to the public at large and the legal profession" by failing to put contingent fee in writing and to charge reasonable fee for services).

¶ 40.    Based on respondent's breach of duty, corresponding mental state, and the harm resulting from respondent's actions, the ABA Standards assign a presumptive sanction for the attorney's misconduct.  Id. ¶ 35.  While these sanctions are not binding on this Court, they provide a helpful guide in assigning an appropriate sanction.  In re McCarty, 164 Vt. 604, 605, 665 A.2d 885, 887 (1995) (mem.) (electing not to adhere to ABA Standards' recommendation for minimum length of suspension).  Here, the panel determined that respondent knowingly violated Rule 1.7, resulting in serious potential harm to C.M. and serious actual injury to the legal profession, therefore the panel determined suspension was the correct presumptive sanction under ABA Standard 4.32.  We agree.

¶ 41.    Standard 4.0 applies to "Violations of Duties Owed to Clients."  ABA Standards § 4.0.  The introduction to Standard 4.0 expressly states that it applies to violations of Rule 1.7. Id.  Standard 4.32 provides for suspension "when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."  Id. § 4.32.  Respondent argues that we should apply Standard 4.34, which suggests that "[a]dmonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the representation of a client may be materially affected by the lawyer's own interests . . . and causes little or no actual or potential injury to the client." Id. § 4.34. Here, respondent knowingly entered a relationship with C.M.; he was aware of potential conflicts

inherent in his relationship with a client, yet he did not obtain signed consent to the conflict from C.M., in violation of Rule 1.7; and his actions caused potential injury to C.M. in her divorce proceedings. Therefore, we conclude that suspension under Standard 4.32 is the appropriate sanction.

## B. Rule 4.3 (Dealing with Unrepresented Person)

¶ 42. Next, the panel concluded that respondent committed two distinct violations of Rule 4.3 when he: (1) failed to take reasonable steps to correct P.B.'s misunderstanding about his role in the September 2012 agreement—namely, that he was acting in his own interest and not representing P.B. in any way; and (2) failed to advise P.B. that she should consult an independent attorney before signing the waiver. Rule 4.3 states, in relevant part:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or should reasonably know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

V.R.Pr.C. 4.3. We agree with the panel's conclusion that respondent's conduct with P.B. violated Rule 4.3.

¶ 43. Regarding respondent's mental state, the panel concluded that respondent acted knowingly when he "presented a document to [P.B.] that included the clause waiving her right to assert future claims of gender discrimination and sexual harassment and language representing that the terms of the agreement protected both of their interests." We agree with the panel that, while a case could be made that respondent acted negligently in failing to make reasonable efforts to clarify his role in connection with the agreement, the facts demonstrate that respondent knowingly

22

prepared the final version of the agreement with his step-brother's assistance with the intent to secure a waiver clause to prevent P.B. from bringing "any and all" claims against him. In addition, respondent—an attorney—knew that P.B. was unsophisticated in legal matters, that P.B. was a highly vulnerable individual struggling with various mental-health issues, and that there were conflicting interests at stake in the September 2012 agreement. P.B. was also a former client and, as such, it would be reasonable for her to assume that respondent was acting on her behalf. Considering these factors, respondent's failure to clarify that he was in no way representing P.B.'s interests when asking her to sign the agreement or to advise her to seek legal counsel of her own constitutes a knowing violation of Rule 4.3.[5]

¶ 44. Regarding the harm caused by respondent's actions, the panel concluded that signing the agreement resulted in potential injury to P.B. because the waiver clause may have discouraged P.B. from filing any gender-discrimination or sexual-harassment claims against respondent and, even if she had overcome this hurdle and filed such a claim, the waiver may have barred the claim if a court found the agreement to be valid. The panel further concluded that the agreement, standing alone, caused "substantial injury to the legal system and the profession." The panel stated:

> Respondent's effort, through the waiver clause, to shield himself from liability for discrimination in connection with conduct that had not yet occurred . . . was fundamentally inconsistent with the expectation that lawyers should seek justice at all times. . . . Such an agreement could only decrease confidence in the legal profession.

We agree with the panel that respondent's request that P.B. sign the September 2012 agreement presented potential injury to P.B. and caused serious injury to the legal profession.

---

[5] Respondent's step-brother testified that he verbally advised P.B. to seek counsel. However, there is no evidence that respondent was aware of his step-brother's advice and the step-brother's acts do not excuse respondent's failure to comply with the Rules of Professional Conduct.

¶ 45. The panel applied Standard 7.2, which carries a presumptive sanction of suspension, to respondent's violation of Rule 4.3. Standard 7.2 provides: "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." ABA Standards § 7.2.

¶ 46. However, the final sanction determination for respondent's conduct rests with this Court. As noted above, we are not required to defer to the panel's conclusion that suspension is the appropriate presumptive sanction under Standard 7.2. See supra, Part III. While we give the panel's recommendation consideration, we conduct our own analysis to determine the appropriate sanction. Disciplinary counsel advocates that Standard 7.1, which carries a presumptive sanction of disbarment, rather than Standard 7.2, is applicable to respondent's violations of Rules 4.3 and 8.4(g). See infra, Part V(D). We agree with disciplinary counsel's assessment and determine that Standard 7.1 is more appropriate than Standard 7.2 in this instance.[6]

---

[6] We note that the ABA Standards recommend that Standard 6.3 (Improper Communications with Individuals in the Legal System) applies to violations of Rule 4.3. ABA Standards, Appendix I. As explained above, the ABA Standards provide guidance in setting appropriate sanctions, but they are not binding on this Court. See supra, ¶ 40. Here, we find Standard 6.3 to be inapplicable to the facts at issue. Standard 6.3 provides that "the following sanctions are generally appropriate in cases involving attempts to influence a judge, juror, prospective juror or other official by means prohibited by law"—P.B. does not fit into any of these categories. ABA Standards § 6.3 (emphasis added). Based on the introduction and commentary to Standard 6.3, as well as the language of the standard subparts, we conclude that this standard is not applicable to this violation. Considering that the ABA Standards' recommended standard is not applicable, we agree with disciplinary counsel that Standard 7.0 (Violations of Other Duties Owed as a Professional) is most applicable in this case. Cf. ABA Standards §§ 4.0 (Violations of Duties Owed to Clients); 5.0 (Violations of Duties Owed to the Public); 6.0 (Violations of Duties Owed to the Legal System).

¶ 47. Standard 7.0 applies to "Violations of Other Duties Owed as a Professional."[7]

Under the umbrella of Standard 7.0, there are four standards, Standards 7.1, 7.2, 7.3, and 7.4, which provide for a presumptive sanction depending on the severity of respondent's misconduct. See ABA Standards §§ 7.1 (disbarment), 7.2 (suspension), 7.3 (reprimand), 7.4 (admonition). Standard 7.2, applied by the panel, and Standard 7.1, advocated by disciplinary counsel here, are nearly identical. Standard 7.2 provides for suspension "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system." ABA Standards § 7.2. Standard 7.1 provides for

---

[7] The introduction to Standard 7.0 explains that the Rules of Professional conduct "include many ethical standards that are not fundamental to the professional relationship but which define certain standards of conduct." ABA Standards § 7.0, Intro. Standard 7.0 provides a nonexclusive list of cases in which the Standard 7.0 sanctions "are generally appropriate," including "cases involving false or misleading communication about the lawyer or the lawyer's services, improper communication of fields of practice, improper solicitation of professional employment from a prospective client, unreasonable or improper fees, unauthorized practice of law, improper withdrawal from representation, or failure to report professional misconduct." Id. In the past, we have refused to apply Standard 7.0 as the presumptive sanction when "[n]one of the behaviors [stated in the introduction to Standard 7.0] matche[d] respondent's conduct" and another standard "clearly appl[ied]." Strouse, 2011 VT 77, ¶¶ 22, 24 (concluding Standard 5.1, not Standard 7.0, was applicable to attorney's violation of 8.4(c) when she failed to disclose to her supervising attorney her continuing romantic relationship with husband of firm's divorce client). However, we have also recognized that multiple interpretations of the ABA Standards are "plausible because the language used in the ABA Standards is relatively broad and subjective," and our application of the standards requires a fact-intensive inquiry. Id. ¶¶ 20, 22 (attempting to "match" respondent's conduct to broad and subjective categories of behaviors outlined in ABA standards).

Here, unlike Strouse, there is not another "clearly applicable" standard for respondent's grossly deceitful conduct toward a vulnerable and unrepresented individual, which resulted in serious potential injury to P.B., the public, and the legal system. We conclude that Standard 7.0 is the most appropriate standard for respondent's actions in this case, which violated his duties owed as a professional. The commentary to Standards 7.1, 7.2, and 7.3 elaborate that Standard 7.0 is applicable in situations involving "falsehoods and omissions," such as intentionally making false material statements on a bar application, charging excessive or improper fees, or neglecting to properly instruct employees regarding what constitutes solicitation. ABA Standards §§ 7.1-7.3, cmt. Thus, we conclude that Standard 7.0 is the most applicable ABA Standard for this rule violation—whether the respondent's conduct was expressly included in the Standard 7.0 categories is not dispositive. See supra, ¶ 40 (explaining that ABA Standards merely guide Court's analysis).

25

disbarment "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional <u>with the intent to obtain a benefit for the lawyer</u> or another, and causes serious or potentially serious injury to a client, the public, or the legal system." ABA Standards § 7.1 (emphasis added). Here, we conclude that Standard 7.1 is the presumptive sanction.

¶ 48. As explained above, respondent knowingly presented the 2012 contract to P.B. and asked her, an unrepresented individual unsophisticated in legal matters, to sign the contract and waive <u>any and all</u> sexual harassment or discrimination claims against him—past or future. Respondent never clarified that he was not representing P.B.'s interests in the transaction, but was, in fact, representing his own, and he did not advise her to seek counsel to protect her interests. While respondent's failure to suggest that P.B. obtain independent counsel could be couched as a careless omission, respondent's request that P.B. formally waive any claims against him by signing the 2012 contract was most certainly presented and executed "with the intent to obtain a benefit" for respondent—protection from future suit or liability. ABA Standards § 7.1. Although a court may not have enforced the waiver if called upon to construe it, there is no assurance that P.B. would realize the potential to file suit still existed despite her signing the waiver. The intent behind the document was to provide protection for respondent, for acts that had already occurred and potential future acts, and the document on its face appeared to make him immune from sexual-harassment and gender-discrimination suits. These actions resulted in "potentially serious injury" to P.B. by discouraging her from filing a complaint against respondent and, if the agreement had been found enforceable, waiving her claims against him.

¶ 49. The severity of a presumptive sanction increases with the "seriousness of the reflection [of the violation] on the lawyer's fitness to practice [law]." Strouse, 2011 VT 77, ¶ 24. Here, respondent's misconduct took advantage of a vulnerable and unrepresented party who was

26

also a former client to advance his own interests—a gross dereliction of the duties respondent owed as a professional with the potential for serious impact on the integrity of our system of justice. As such, Standard 7.1 is more applicable to this case than Standard 7.2, and the presumptive sanction for respondent's violation of Rule 4.3 is disbarment.[8]

## C. Rule 8.4(d) (Misconduct—Prejudicial to Administration of Justice)

¶ 50. The panel concluded, sua sponte, that respondent violated Rule 8.4(d), which provides that "[i]t is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice," when he proposed and executed the September agreement that was intended to absolve respondent of liability for past and future gender-discrimination and sexual-harassment claims. V.R.Pr.C. 8.4(d). The parties were given the opportunity to brief: (1) whether the panel was barred from considering, on its own initiative, whether respondent violated Rule 8.4(d); and (2) whether respondent's misconduct, in fact, violated Rule 8.4(d). On appeal, respondent asserts that the panel's action, disciplining him for violating an uncharged rule, violated the procedural protections of Administrative Order 9. We conclude that the panel's actions ran afoul of Administrative Order 9's procedural rules because, even if the panel had the authority to sua sponte consider an uncharged rule violation, the panel failed to provide respondent with the opportunity to contest and provide evidence regarding the alleged violation at the evidentiary hearing.

---

[8] We recognize that the introduction to ABA Standard 7.0 states that, "[i]n general, . . . a sanction of disbarment or suspension will rarely be required" because "a violation of [Standard 7.0] generally is less likely to cause injury to a client, the public, or the administration of justice than . . . other standards." ABA Standards § 7.0, Intro. However, the introduction also recognizes that "[w]hile it will as a rule be inappropriate to impose a sanction of disbarment . . . there are situations when a more severe sanction should be imposed." This is such a case.

¶ 51.   Administrative Order 9 clearly outlines procedures for screening misconduct allegations for probable cause prior to submitting formal charges and conducting a hearing in response to a petition of misconduct.  A.O. 9 § 11.  Section 11(A) provides that disciplinary counsel must give a respondent notice in writing "of the substance of the matter under investigation."  A.O. 9 § 11(A).  Section 11(C) explains that "[d]isciplinary counsel's decision to proceed with a petition of misconduct shall be reviewed for probable cause by a hearing panel assigned by the chair of the Board . . . .  If the panel finds probable cause to believe that a violation has occurred, disciplinary counsel shall present formal charges to a different hearing panel assigned by the chair of the Board, unless a stipulation to misconduct is earlier submitted."  A.O. 9 § 11(C).  Following the probable cause determination, disciplinary counsel may initiate formal proceedings against the respondent "by filing with the Board and serving upon respondent a petition of misconduct which is sufficiently clear to inform respondent of the alleged misconduct and the rules alleged to have been violated."  A.O. 9 § 11(D) (emphasis added).  Administrative Order 9 further requires that "[t]he notice of hearing on a petition of misconduct shall state that the respondent is entitled to be represented by a lawyer, to cross-examine witnesses, and to present evidence."  A.O. 9 § 11(D)(4) (emphases added).  Failure to comport with this procedure carries due process implications that run counter to our requirements.

¶ 52.   Here, the petition did not notify respondent that he would be charged with violating Rule 8.4(d), as such respondent was not on notice that he should present evidence during the hearing to contest such a charge.  Respondent did not learn of the additional Rule 8.4(d) allegation until after the close of the evidentiary hearing—when it was too late to provide additional evidence or testimony on the matter.  Although respondent was given the opportunity to provide supplemental briefing in response to the late addition of the Rule 8.4(d) violation, Administrative

28

Order 9 clearly states that respondent is entitled to know the rules alleged to have been violated and to present evidence at the hearing. See A.O. 9 § 11(D). Because the panel elected to sua sponte consider the Rule 8.4(d) violation after the close of the evidentiary hearing and provided no accommodation for the parties, particularly respondent, to present evidence in response, we conclude that the panel was precluded from considering whether respondent violated this rule.[9] Accordingly, we reverse on this issue. However, we agree with the panel's conclusions that respondent violated Rules 1.7, 4.3, and 8.4(g), each of which carries a presumptive sanction of suspension or disbarment in this case. Therefore, our reversal of the panel on the Rule 8.4(d) violation does not impact our ultimate sanction determination.

### D. Rule 8.4(g) (Misconduct—Discrimination)

¶ 53. Finally, the panel concluded that respondent violated Rule 8.4(g), which states, "[i]t is professional misconduct for a lawyer to . . . discriminate against any individual because of his or her . . . sex . . . in hiring, promoting or otherwise determining the conditions of employment." V.R.Pr.C. 8.4(g).[10] In so concluding, the panel determined that: (1) respondent's conduct toward

---

[9] The panel determined that respondent violated Rule 8.4(d) based on the facts before it— that respondent presented to P.B. and executed the 2012 agreement purporting to waive any claims against him—and that no additional evidence could alter the outcome of the Rule 8.4(d) determination. Even if the panel's assertion is true and no evidence could alter its ultimate conclusion, the ends do not justify the means—the panel cannot propose and conclude that respondent committed an uncharged rule violation while at the same time circumventing the procedural protections guaranteed to him.

Because we conclude that the panel's addition of the Rule 8.4(d) violation after the close of the hearing failed to provide the parties with the opportunity to present evidence, running afoul of the procedural protections outlined in Administrative Order 9, we do not address whether a disciplinary panel may sua sponte consider rule violations not outlined in the initial petition of misconduct under other circumstances.

[10] Rule 8.4(g) was amended, effective September 18, 2017. However, we apply the version of Rule 8.4(g) in effect at the time of respondent's misconduct in conducting our analysis.

P.B.—including the paperclip incident and the masturbation incident—created a hostile work environment tantamount to sexual harassment; and (2) the waiver clause in the September 2012 agreement constituted quid pro quo sexual harassment because it implicitly conditioned P.B.'s employment upon submitting to unwanted sexual advances "by placing [P.B.] in a position where she could not as a practical matter assert a claim of discrimination or harassment against her employer going forward." We agree that respondent's actions violated Rule 8.4(g) by creating a hostile work environment for P.B. and implicitly conditioning P.B.'s future employment on her agreement not to file future discrimination and sexual-harassment claims.[11]

---

[11] We do not conclude that asking an employee to sign a voluntary acknowledgement of a consensual relationship always amounts to quid pro quo harassment. However, in this case, there is sufficient circumstantial evidence to support the inference that P.B. reasonably believed that signing the agreement, and submitting to respondent's unwanted sexual advances without recourse, was a condition of her employment. First, the 2012 contract not only acknowledged that respondent and P.B. were in a sexual relationship, but also provided respondent with a prospective exculpatory release from any past or future impropriety. Second, although P.B. refused to sign the agreement in June, later explaining that she was "intimidated" and "uncomfortable," P.B. stated that she signed the 2012 agreement in the fall because she believed that she and respondent would "be in trouble" if they did not sign the agreement. It is reasonable to infer that P.B. believed that rejecting the agreement a second time and "be[ing] in trouble" with respondent's step-father would have negative ramifications on her employment. Finally, terms within the contract indicate the quid pro quo nature of the agreement. For example, the agreement recites: "[w]hereas, both parties wish to continue their working relationship and set forth terms that protect both Employer and Employee," and includes as apparent consideration respondent's agreement to remain flexible about P.B.'s hours in light of her mental-health issues. The fact that respondent placed P.B., who he knew to have significant mental-health issues, in a situation where she was pressured to admit to the "mutual welcomeness" of their relationship and waive any prospective claims against respondent (or else she would be in trouble), and that she also received assurances that respondent would accommodate her mental-health issues, demonstrates the exploitative nature of the agreement in light of the power differential between respondent and P.B. And, finally, the fact that respondent did not advise P.B. to consult with counsel of her own before signing supports an inference that submitting to unwelcome sexual attention was an implicit requirement for her continued employment. Thus, we agree with the panel that there is sufficient evidence to conclude that asking P.B. to sign the agreement constituted quid pro quo sexual harassment under these limited circumstances.

30

¶ 54.    The panel concluded that respondent knowingly and intentionally engaged in sexual conduct with P.B. that was "unwelcome" by her and engendered a hostile work environment. The panel stated, "[h]e was fully aware of his conduct and he was engaging in that conduct to achieve a particular result—his own gratification. . . . The fact that [r]espondent may not have intended to harm [P.B.] by his conduct is not the issue." We agree; the facts support the panel's conclusion that respondent knowingly engaged in sexual conduct with P.B., that his sexual advances were "unwelcome," and that they resulted in a hostile work environment.

¶ 55.    The panel also concluded that respondent knowingly entered into the September 2012 agreement with the intention of shielding himself from potential discrimination or sexual-harassment claims from P.B. There was little, if any, benefit to P.B. from entering the agreement, which appeared to leave her without recourse regarding any unwelcome sexual conduct in the workplace. As explained in our analysis of respondent's mental state pertaining to the agreement in the context of the Rule 4.3 violation, we agree with the panel that respondent acted knowingly.

¶ 56.    The panel found that "[w]ith respect to [r]espondent's unwelcome sexual conduct involving [P.B.], there was serious emotional harm to her." Based on the comments that P.B. made to her mother and her psychiatrist, as well as the email P.B. sent to respondent notifying him that she felt uncomfortable in the workplace, we agree that the evidence demonstrates P.B. suffered direct harm from respondent's actions during the paperclip and masturbation incidents. As noted above, we also concur that entering into the September 2012 agreement with P.B. and implicitly conditioning her continued employment on her waiver of future claims against respondent caused potential harm to P.B. and substantial injury to the legal profession.

¶ 57.    The panel applied Standard 7.2 to respondent's violations of Rule 8.4(g), resulting in suspension as the presumptive sanction. See ABA Standards § 7.2. However, due to

31

respondent's intent to benefit himself through his actions and the seriousness of the reflection of respondent's Rule 8.4(g) violation on his fitness to practice law, Strouse, 2011 VT 77, ¶ 24, we conclude that Standard 7.1, which provides for disbarment, is more appropriate in this situation.[12]

¶ 58. As explained above, Standard 7.1 provides for disbarment "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system." ABA Standards § 7.1 (emphasis added). Here, respondent knowingly engaged in unwanted sexual conduct with P.B. "to achieve a particular result—his own gratification." Respondent violated his duties owed as a professional with the intent to benefit himself, resulting in serious harm to P.B. and the legal profession. Accordingly, disbarment under Standard 7.1 is the appropriate presumptive sanction.

¶ 59. Based on the conclusions listed above, the presumptive sanction for respondent's violation of Rule 1.7 is suspension; the presumptive sanction for respondent's violations of Rules 4.3 and 8.4(g) is disbarment.

## VI. Aggravating and Mitigating Factors

¶ 60. Next, the ABA Standards direct us to consider any aggravating and/or mitigating factors present in this case and to determine whether these factors justify a lesser or greater sanction than presumed—here, disbarment. See ABA Standards § 9.1 ("After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose."). Aggravating or mitigating circumstances are considerations or factors that may justify an increase or decrease in the degree of discipline to be imposed. Id. §§ 9.21, 9.31.

---

[12] The ABA Standards do not provide a recommended standard for violations of Rule 8.4(g). Absent guidance from the ABA Standards on this point, we concur with the panel's recommendation that sanctions under Standard 7.0 are appropriate in this case.

Nonexclusive lists of potential aggravating and mitigating factors recognized by the ABA Standards are included under Standards 9.22 and 9.32.

¶ 61.    In weighing the aggravating and mitigating factors, the panel determined that the aggravating factors significantly outweighed the mitigating factors.[13]    Based on these considerations, the panel applied a presumptive sanction of suspension, but only suspended respondent from practice for two years.  Respondent argues that the mitigating factors outweigh the aggravating ones, including the delay in these proceedings and respondent's remorse.  Upon weighing the aggravating and mitigating factors, we not only depart from the panel's assigned sanction, but we also conclude that the aggravating factors present are so serious as to justify the presumptive sanction of disbarment.

¶ 62.    Here, particular consideration of two of the aggravating factors—Standard 9.22(c) pattern of misconduct and Standard 9.22(h) vulnerability of victims—leads us to the conclusion that disbarment is appropriate.

¶ 63.    First, relevant to Standard 9.22(h) (vulnerability of victims), both C.M. and P.B. were in vulnerable positions during their interactions with respondent.  According the facts as found by the panel, respondent began a relationship with C.M. after she retained him to represent her in her divorce proceedings—she had just separated from her husband of sixteen years and had limited financial means.  Despite the potential conflict of interest, respondent did not have C.M.

---

[13] The ABA Standards set forth the aggravating and mitigating factors in two separate, alphabetical lists.  The panel found that the following aggravating factors under Standard 9.22 were present: (b) dishonest or selfish motive; (c) pattern of misconduct; (d) multiple offenses; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victims; (i) substantial experience in the practice of law; and (k) illegal conduct.  The panel considered a number of respondent's alleged mitigating factors, but only found the following to be credible: (a) the absence of a prior disciplinary record; (c) personal or emotional problems; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (g) character and reputation; (j) delay in disciplinary proceedings.

sign a waiver acknowledging that she knew, understood, and consented to the risks associated with a sexual relationship between attorney and client. Additionally, respondent knew that C.M., who was involved in a contentious divorce proceeding that included contested parent-child contact issues, was struggling financially and was concerned with the monetary outcome of the divorce proceedings. In entering a relationship with C.M. at that time, he offered that she could stay at his home and provided her work at his tanning salon business to alleviate her financial burden. These actions demonstrate that respondent encouraged C.M.'s dependence on him, yet failed to properly inform her and gain her written consent to the potential conflicts inherent in their relationship. Respondent's actions in seeking to keep his relationship with C.M. a secret in the area of the state where he practiced, is, as the panel determined, evidence that he "harbor[ed] concerns or uncertainty about whether the relationship was ethically acceptable." Respondent then ended his relationship with C.M. at virtually the same time he concluded her divorce proceedings, predictably leaving her feeling abandoned, misled, and poorly represented.

¶ 64.　Similarly, P.B. came to respondent for legal advice. At the time she was dealing with criminal charges, living at home with her parents, and receiving treatment for mental-health issues. As with C.M., respondent offered P.B. a job, which she believed would help her demonstrate employment in the legal field. Respondent entered into a sexual relationship with P.B. while she was his employee at his law office. Respondent engaged in unwanted sexual conduct with P.B. at his law office and continued the sexual relationship even after P.B. sent him an email stating that his behavior was making her uncomfortable at work. Importantly, respondent raised the issue of signing the waiver absolving him of any potential liability for workplace harassment once again very shortly after he received the email from P.B. complaining about the conditions at work. Even though respondent knew that P.B. had mental-health issues and was

34

unsophisticated in legal matters, he asked her to sign an agreement waiving any potential future legal claims against him for discrimination or sexual harassment. Respondent further disadvantaged P.B. by failing to inform her that, even though he had served as her legal counsel in the past, he was not acting on her behalf in the contractual proceedings and that she should seek her own legal counsel. In sum, respondent repeatedly used a vulnerable individual for his own sexual gratification despite her discomfort, which she made known to respondent, and then protected himself from the ramifications of these actions by misleading her, an unrepresented individual, into signing a contract waiving her rights to bring legal claims against him for discriminatory and harassing conduct.

¶ 65. These findings demonstrate that, on more than one occasion, respondent targeted vulnerable individuals and engaged in activity contrary to our Rules of Professional Conduct; we weigh this heavily in our sanction determination.

¶ 66. Although we have no caselaw on point in Vermont, caselaw from other jurisdictions supports our position on this issue. See In re Berg, 955 P.2d 1240, 1257 (Kan. 1998) (finding aggravating circumstances when attorney committed "flagrant violations of his fiduciary duty to women who placed their rights and trust in his hands" by engaging "in inappropriate sexual behavior with numerous clients who were very vulnerable"); In re Vogel, 482 S.W.3d 520, 539 (Tenn. 2016) (finding aggravating circumstances when attorney engaged in sexual relationship with "vulnerable" female client—she was young, lacked financial resources, and viewed attorney as "authority figure"—who he later employed at his law office); Lawyer Disciplinary Bd. v. White, 811 S.E.2d 893, 900 (W. Va. 2018) (finding aggravating circumstances when attorney engaged in sexual relationship with vulnerable client while representing her on criminal charges).

¶ 67. Respondent's actions also represent a pattern of misconduct under Standard 9.22(h). He demonstrated a pattern of sexual behavior—some consensual and some unwanted—toward female clients in vulnerable positions whom he encountered because they sought him out for his legal services. As noted above, both C.M. and P.B. were struggling with difficult life circumstances (divorce, criminal charges, financial instability, and/or mental-health issues) when they began their respective relationships with respondent and at the time respondent's misconduct occurred. During these relationships, respondent strategically omitted to inform C.M. and P.B. about essential legal safeguards to secure his own interests: he failed to obtain signed consent from C.M. acknowledging that she understood the risks associated with a client-attorney relationship and the conflicts of interest that may arise; and he asked P.B. to sign the September 2012 agreement waiving her rights to bring future and past legal claims against him without informing her that he was not representing her interests and that she should seek independent counsel. Looking solely at respondent's behavior with C.M. and P.B.—the behavior giving rise to the violations of professional misconduct at issue here—there is evidence of a disturbing pattern of misconduct.[14] Respondent's argument that these were different types of misconduct—conflict of interest, misconduct with an unrepresented person, and discrimination—and therefore cannot constitute a "pattern of misconduct" is unpersuasive in light of the factual similarities and context of the misconduct.

¶ 68. Respondent further contends that the panel incorrectly considered his behavior with P.B. to be illegal conduct and an aggravating factor under Standard 9.22(k). The panel determined that "Vermont law prohibits discrimination in the form of sexual harassment"; that respondent

---

[14] We do not consider the facts found by the panel relating to respondent's conduct with two other clients, one of whom he also hired as an employee.

sexually harassed P.B. through his misconduct; and that "[r]espondent's sexual harassment of [P.B.] constituted illegal conduct." The panel supported this conclusion by referencing In re Tenenbaum, in which the court found, under similar circumstances, that an attorney's sexual harassment of his female clients and employees constituted illegal conduct and an aggravating factor under Standard 9.22(k). 880 A.2d 1025, 1035 (Del. 2005). The panel further noted that "[s]exual harassment is prohibited under [the Fair Employment Practices Act]. It may not be criminal conduct, but it is illegal nonetheless." We find the panel's analysis persuasive and consider respondent's illegal conduct to be an aggravating factor.

¶ 69. To the extent that mitigating factors are present, we agree with the panel that, generally, a lack of prior disciplinary history is persuasive in favor of leniency. See In re Pope, 2014 VT 94, ¶ 14, 197 Vt. 638, 101 A.3d 1284 (mem.) (noting respondent's lack of prior disciplinary record was mitigating factor); In re Neisner, 2010 VT 102, ¶ 20, 189 Vt. 145, 16 A.3d 587 (finding respondent's lack of prior disciplinary record to be mitigating factor when it was "the first disciplinary action against him"). In this case we conclude that, although respondent has no prior history of misconduct, the fact that respondent committed multiple violations spanning several years with different and vulnerable victims tempers the force of this factor.

¶ 70. Respondent argues that the delay in proceedings should be considered a substantial mitigating factor. The initial investigation into respondent's misconduct occurred in early 2013, the charges against respondent were not brought to a hearing until November 2017, and the panel did not issue an order until March 2018. We have recognized that delay in disciplinary proceedings may carry weight as a mitigating factor, particularly when a respondent has not violated the Rules in the interim, see McCarty, 2013 VT 47, ¶¶ 33-34 (providing "some weight in mitigation to delay" when matter was delayed for approximately ten years "and, in the interim, respondent [had] not

had other violations brought against him" (quotation omitted)), and we acknowledge that delay in proceedings is a mitigating factor in this case. However, the panel found that the parties' attempt to achieve resolution of the matter on the basis of stipulated facts significantly contributed to the delay. The panel rejected the stipulation in March 2017, after which disciplinary counsel proceeded to bring charges before the panel. Respondent was permitted to maintain his law license and continue practicing throughout the disciplinary proceedings. Thus, we conclude that the delay in proceedings does not outweigh the aggravating circumstances.

¶ 71. Finally, respondent takes issue with the panel's failure to credit respondent's remorse as a mitigating factor under Standard 9.32(1). On this issue, the panel determined that it could not "find that [r]espondent has shown remorse for his conduct" because "he denied any wrongdoing throughout the proceeding" and "rel[ied] on post-hearing statements by his therapist in her letter to the effect that he has expressed remorse for 'how he understands he hurt these . . . women' and has accepted responsibility for his conduct." We consider respondent's indications of remorse to his therapist to be a mitigating factor. While we do not agree with the panel's categorical statement that respondent cannot speak through a third person, the mitigating weight of this factor is diminished, as the panel accurately observed, by the respondent's failure to personally indicate remorse throughout the proceedings beyond his observation that "he might have made a different choice." See Strouse, 2011 VT 77, ¶ 33 (finding respondent showed remorse when, despite prior denials of misconduct, respondent personally testified, "these aren't things that I'm very proud of, . . . I tried to take this situation and learn from it what I could and really not dwell on any of it, so I'm terribly regretful").

¶ 72. Regarding the rest of the aggravating and mitigating factors, we adopt the panel's analysis.[15] See supra, ¶ 61 n.13. We conclude that the aggravating factors outweigh the mitigating factors, and that the sanction should reflect as such.

VII. Sanction

¶ 73. In determining the appropriate sanction to apply in this case, we reiterate that "the purpose of sanctions is to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar, as well as to deter other attorneys from engaging in misconduct." Neisner, 2012 VT 102, ¶ 24 (quotation omitted). In our sanction determination, we adhere to the Vermont Rules of Professional Conduct and look to the ABA Standards for guidance. Based on our analysis, the presumptive sanction under the ABA Standards is disbarment, and our analysis of the aggravating and mitigating factors give us no reason to depart from that presumption.

¶ 74. In the past, we have looked to sanctions imposed in other cases to aid us in measuring out a sanction. See, e.g., Pope, 2014 VT 94, ¶ 14 (comparing sanction in Pope to "recently imposed two-year suspension" in Neisner, 2012 VT 102). However, we recognize that "meaningful comparisons of attorney sanction cases are difficult as the behavior that leads to sanction varies so widely between cases." Strouse, 2011 VT 77, ¶ 43 (Dooley, J., dissenting). To

---

[15] Respondent also argues that his violations of multiple Rules of Professional Conduct—Rules 1.7, 4.3, and 8.4(g)—should not constitute multiple offenses, an aggravating factor under Standard 9.22(d). We disagree; here, respondent's multiple violations of the Rules of Professional Conduct based on several instances of misconduct with two clients constitutes multiple offenses. See In re Blais, 174 Vt. 628, 628, 817 A.2d 1266, 1267 (2002) (mem.) (finding multiple offenses when respondent engaged in "misconduct consisting of five instances of neglecting client matters and three instances of misrepresentation"); In re Bucknam, 160 Vt. 355, 366, 628 A.2d 932, 938 (1993) (holding that multiple violations against single client constituted multiple offenses, but not pattern of misconduct). Regarding respondent's assertions that his substantial experience in the practice of law should not be considered an aggravating factor, ABA Standards § 9.22(i), and that the imposition of other penalties and sanctions should be a mitigating factor, id. § 9.32(k), we adopt the panel's conclusions. See supra, ¶ 61 n.13.

date, there is no Vermont case that aligns with the unique facts present here, and the sanctions imposed by courts in other jurisdictions for misconduct similar to respondent's are varied.

¶ 75. Recent Vermont caselaw indicates that we have applied a two-year suspension when attorneys engaged in criminal conduct that "undermined public confidence in the integrity of the bar and the administration of justice." Pope, 2014 VT 94, ¶ 14 (considering other state's two-year suspension appropriate for attorney convicted of identity theft against elderly friend); Neisner, 2012 VT 102, ¶ 26 (finding two-year suspension for attorney convicted of four criminal offenses in line with "sanctions that [this Court] and the Professional Responsibility Board have imposed in other professional responsibility cases"). However, in those cases, the vulnerability of the relevant victims was not emphasized as an aggravating factor and the criminal conduct was not directly related to the respondents' use of their law licenses.[16] Here, even though respondent was not convicted of criminal charges, the panel concluded that the "violations found in this proceeding should be considered no less serious and no less deserving of a substantial suspension than the [criminal] conduct at issue in Pope and Neisner." However, because neither Pope nor Neisner reflects the same aggravating factors or type of damage dealt to the public's perception of the legal profession as the case here, Vermont's caselaw does not persuade us that we should depart from the presumptive sanction of disbarment.

---

[16] In Pope, the victim was an elderly friend, but not a client, and there were no findings that the attorney's misconduct—committing identity theft—was related to her practice of law. Similarly, in Neisner, the respondent was convicted of four criminal charges after committing a hit-and-run and implicating his wife as the driver. The victims in that case, the motorcycle driver and potentially the respondent's wife, were not "vulnerable victims" in the manner that C.M. and P.B. are here. The respondent's misconduct in Neisner was not related to his practice of law or his relationships with his clients. Moreover, neither Pope nor Neisner involved a pattern of misconduct, as in this case.

¶ 76. Additionally, Vermont caselaw does not shy away from disbarment when such a penalty is appropriate. In re Karpin, 162 Vt. 163, 173, 647 A.2d 700, 706 (1993) (per curiam) (explaining that "[d]isbarment is an appropriate sanction under the ABA Standards, and the fact that almost every aggravating factor is present confirms disbarment as the appropriate sanction"). In Karpin, we disbarred an attorney who deceived multiple clients and attempted to undermine the disciplinary process, despite his "brevity of practice" and "absence of a disciplinary record," when disbarment was the presumptive sanction and numerous aggravating factors were present. Id. at 174, 647 A.2d at 706. In Wright, we disbarred an attorney who "knowingly and wilfully put himself in a position where he was undoubtedly representing conflicting interests" and did so "in such a manner that he undertook specific actions to benefit one client to the detriment of two other clients." 131 Vt. 473, 480, 310 A.2d 1, 4 (1973) (per curiam). In that case, we noted:

> In some ways, an attorney who deliberately and skillfully operates consistently at the very verge of ethical limits to his own benefit is more to be condemned than the attorney who, on a single occasion, under pressure, definitely breaks through ethical bounds. It is the first [person] that the public abhors, distrusts and condemns with good reason.

Id. at 493, 310 A.2d at 12. Similar to the respondents in Karpin and Wright, respondent here committed multiple violations of the Rules of Professional Conduct, demonstrating a pattern of behavior and injuring the public perception of the legal practice; the presumptive sanction for respondent's actions is disbarment; and the aggravating and mitigating factors present support disbarment. As such, our caselaw indicates that disbarment is the appropriate sanction.

¶ 77. In other jurisdictions, courts have applied penalties ranging from suspension to disbarment for attorney misconduct involving sexual relationships with clients. In re Lewis, 415 S.E.2d 173 (Ga. 1992) (ordering three-year suspension for attorney who had sexual relationship with divorce client); Berg, 955 P.2d at 1257 (ordering disbarment when attorney engaged in sexual

41

relationships with clients after receiving prior probationary sanction for sexual harassment of female clients); <u>Attorney Grievance Comm'n of Maryland v. Hall</u>, 969 A.2d 953, 970 (Md. 2009) (indefinitely suspending attorney's license when attorney engaged in sex with vulnerable client, committed multiple offenses, and had prior, albeit unrelated, disciplinary action); <u>Attorney Grievance Comm'n of Maryland v. Culver</u>, 849 A.2d 423, 450 (Md. 2004) (disbarring respondent for sexual misconduct with client, along with other violations of Rules of Professional Conduct); <u>Vogel</u>, 482 S.W.3d at 520 (ordering one-year suspension for attorney engaging in sexual relationship with vulnerable client); <u>White</u>, 811 S.E.2d at 900 (ordering annulment of attorney's license when attorney engaged in sexual relationship with client, among other aggravating factors, and no mitigating factors were present). As such, comparing the sanctions in "cases from other jurisdictions is of little assistance because the range of sanctions imposed in relation to the misconduct is highly inconsistent." <u>Culver</u>, 849 A.2d at 450.

¶ 78. Here, considering (1) the aggravating circumstances due to the vulnerability of the victims and respondent's pattern of misconduct; (2) the comparatively minimal impact of the mitigating factors; (3) the potential injury and actual harm that respondent's conduct has caused to C.M., P.B., and public perception of the legal practice; and (4) comparisons of the offenses and facts present in this case with other similar cases in which suspension or disbarment was imposed in Vermont and in other jurisdictions, we adhere to the presumptive sanction and order the maximum penalty permitted by our rules—disbarment.

¶ 79. Rule 8 provides that an attorney who is disbarred for misconduct "shall not be eligible for readmission for at least five years." A.O. 9 § 8(A)(1). Additionally, "[a] person who has been disbarred . . . may not apply for reinstatement until the expiration of at least five years

from the effective date of the disbarment."  Id. § 22(A).  The ABA Standards, though not binding

on this Court, similarly state that

> [d]isbarment terminates the individual's status as a lawyer.  Where disbarment is not permanent, procedures should be established for a lawyer who has been disbarred to apply for readmission, provided that: . . . no application should be considered for five years from the effective date of disbarment; and . . . the petitioner must show by clear and convincing evidence . . . rehabilitation and fitness to practice law.

ABA Standards § 2.2.

Glenn Robinson is hereby disbarred from the practice of law for violations of the Vermont Rules of Professional Conduct (Rules 1.7, 4.3, and 8.4(g)); we reverse the panel's conclusion regarding the Rule 8.4(d) violation; and we adopt and incorporate the hearing panel's order regarding the conditions placed on respondent's ability to file a motion seeking permission to resume the practice of law set forth in ¶ 17 of this opinion.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Beth Robinson, Associate Justice


_____
Harold E. Eaton, Jr., Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
Dennis R. Pearson, Superior Judge (Ret.),
Specially Assigned