NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 7

No. 2019-035

In re Stacey Adamski, Esq.                                    Original Jurisdiction
(Office of Disciplinary Counsel)
                                                             Professional Responsibility Board


                                                             September Term, 2019


Hearing Panel No. 4
Jill Lanman Broderick, Chair
Mary K. Parent, Esq., Member
David Tucker, Public Member


Sarah Katz, Disciplinary Counsel, Burlington, for Appellant.

Erin Miller Heins of Langrock Sperry & Wool, LLP, Burlington, for Appellee.


PRESENT:  Reiber, C.J., Robinson and Carroll, JJ., and Skoglund, J. (Ret.), and Pearson,
          Supr. J. (Ret.), Specially Assigned


¶ 1.    **PER CURIAM.**   A hearing panel of the Professional Responsibility Board found that respondent, Stacey Adamski, Esq., engaged in dishonest and deceitful conduct in violation of Vermont Rule of Professional Conduct 8.4(c).  The panel recommended a public reprimand.  We ordered review of this case on our own motion and respondent also appealed.  We uphold the panel's findings and its conclusion that respondent violated Rule 8.4(c).  We conclude that the aggravating factors in this case warrant an increase in the presumptive sanction of a reprimand. We thus impose a fifteen-day suspension to begin thirty days from the date of this order.

¶ 2.    The panel made the following findings after a hearing.  Respondent was admitted to practice in Vermont in 2002.  In May 2017, she joined a Windsor County law firm.  Before she was hired, respondent provided the firm with a list of her then-pending tort cases, which she hoped to continue working on.  Respondent's wife was the plaintiff in one of the cases; she raised a discrimination claim.  Respondent told the firm that her wife's case was well documented and she "like[d] the strength of it."  Respondent continued representing her spouse after joining the firm.  She arranged for notifications and correspondence about the case to be sent to her at the new firm, she used the firm's resources in working on the case, and she kept records of the time she spent working on the case.

¶ 3.    In October 2017, respondent represented her wife at a mediation.  During the mediation, respondent communicated with one of the firm's partners, J.S., by phone and text.  Respondent asked J.S. what the firm's "take" would be if the case settled.  J.S. responded that the firm's standard fee was one-third of the settlement amount.  He asked respondent about her usual fee, and respondent replied, "When it's my wife, 0%.  When I owe my new job some good faith fees for the time I've spent working a case, more than 0."  J.S. then discussed the fee issue with the other partners at respondent's request and told respondent that the firm would accept one-third of the settlement as payment.  Respondent replied, "We will need to talk about that," and J.S. asked respondent to call him.

¶ 4.    Following this communication, the discrimination case settled for $54,000.  Respondent informed J.S. of the settlement and they again discussed the fee issue.  Respondent told J.S. she thought $8000, rather than $18,000, was a reasonable payment.  J.S. told respondent to submit her alternative proposal to the partners.

¶ 5.    Respondent was angry about the partners' fee request.  She told a fellow associate that "[t]here's no way they're going to get my money" and she was unreceptive to the associate's suggestion to work out her dispute with the partners.

2

¶ 6.    Several weeks later, the settlement check—made payable to respondent's spouse—arrived at the firm.  Following standard procedure, a staff person scanned the check into an electronic database; the database contained an electronic case file for each matter handled by the firm.  When respondent learned from her assistant that the check had arrived, she directed her assistant to put it on her desk.  That evening, respondent took the check home with her.  Respondent did not tell anyone she did so.

¶ 7.    The following day, respondent deleted the electronic copy of the check and a cover letter from opposing counsel from the firm's database.  She also deleted a letter from the Office of the Attorney General related to the closing of her wife's case.  Respondent acknowledged that she intended to delete the first two items and the panel so found.  The panel could not find by clear and convincing evidence that respondent intended to delete the other correspondence.  Respondent did not tell anyone at the firm that she intended to delete these records nor did she reveal to anyone that she had done so.  Contrary to usual practice, respondent also kept the paper file associated with her wife's case in her office following the mediation rather than returning it to the filing cabinet near her assistant's desk.

¶ 8.    On two occasions after the mediation, the firm's managing partner asked J.S. and later respondent's assistant whether the check had been received by the firm.  They both initially indicated that they had no information.  On the second occasion, respondent was out of the office and the managing partner asked her assistant if she had seen a settlement check.  The assistant became visibly nervous and asked the managing partner to talk directly to respondent.  Eventually, the assistant told him that the case had settled and the check had arrived several weeks earlier.  The managing partner then tried unsuccessfully to find the paper file for the case or an electronic record that would provide evidence of the settlement or the check.

¶ 9.    The managing partner met with respondent when she arrived at the office later that day.  In response to his questions, she confirmed that a settlement had been reached at the

3

mediation; settlement documents had been signed; a check had been issued; the check was at her house; and the check had not yet been cashed. When he asked respondent why she had not said anything about the check arriving, she replied that she had told J.S. on the day of the mediation that the requested fee was unreasonable and suggested a $8000 fee instead. Respondent told the managing partner that "the ball is in your court." At that point, the managing partner ended the meeting, telling respondent that he would get back to her.

¶ 10. The managing partner subsequently learned from respondent's assistant that a copy of the check had been scanned into the electronic database. At his request, a staff member searched the database and discovered that respondent had deleted various documents related to the case, including a copy of the settlement check and cover letter as well as correspondence from the Attorney General's Office confirming the settlement.

¶ 11. After consulting with the other partners, he and two other partners called respondent, who was working in a different office that day. They called to inform her that the firm had cut off her access to the firm's computer system and that they would be suspending her while they gathered more information about the settlement check. When questioned, respondent confirmed that the check had been mailed to the office and that she had deleted the electronic copy of the settlement check from the firm's computer system. The managing partner expressed his concern to respondent about the missing records and the firm's related ethical obligations to its client. He asked for and received an assurance from respondent that respondent's spouse had the check. After being told she was being suspended, respondent immediately resigned. At some point in the conversation, the partner told respondent that the firm would not press the issue of its fee. That day, respondent deposited the settlement check. The firm later sent a formal letter to respondent's spouse waiving its interest in a portion of the settlement proceeds.

¶ 12. Based on these and other findings, the panel concluded that respondent violated Rule 8.4(c) by engaging "in conduct involving dishonesty . . . [and] deceit." V.R.Pr.C. 8.4(c). It

concluded that respondent intentionally tried to conceal the settlement check from the firm's partners to prevent them from holding the check or taking some disputed portion of it pending resolution of the fee dispute. She did so knowing that the partners had asserted a financial interest in the proceeds. Respondent did not disclose or memorialize her actions. The panel found her conduct dishonest and deceitful.

¶ 13. The panel found its decision reinforced by other evidence, including respondent's expression of anger to another associate about the firm's fee and her reference to the fee dispute when confronted by the managing partner. Additionally, the panel found that respondent had waited to see what the partners would do before depositing the settlement check. Her behavior was consistent with an intent to conceal the check and see if the dispute would simply go away. The panel found transparency particularly important in this case given that respondent had a personal financial interest in the settlement proceeds that conflicted with the firm's interests. Rather than being forthright with her colleagues, respondent concealed information to advance her own interests.

¶ 14. The panel rejected respondent's varied attempts to justify her behavior, finding much of her testimony "highly questionable," unsupported by the evidence, or not credible. In sum, the panel concluded that respondent's conduct was dishonest and deceitful and that it reflected adversely on her fitness to practice law in violation of Rule 8.4(c).

¶ 15. To determine an appropriate sanction, the panel looked to the ABA Standards for Imposing Lawyer Sanctions and considered: (1) the duty violated; (2) respondent's mental state; (3) the actual or potential injury caused by her misconduct; and (4) the presence of aggravating or mitigating factors. Ctr. for Prof'l Responsibility, Am. Bar Ass'n, Standards for Imposing Lawyer Sanctions 3.0 (1986) (amended 1992) [hereinafter ABA Standards]; see also In re Robinson, 2019 VT 8, ¶ 33, __ Vt. __, 209 A.3d 570 (recognizing that ABA Standards "guide our sanctions determinations").

¶ 16.    It found that respondent violated her duty to the general public and to the legal profession to refrain from engaging in dishonest and deceitful conduct.  It determined that the firm had not suffered any financial harm because it ultimately waived any interest in the settlement proceedings.  It did find that the firm was harmed by the damaged relationship of trust and honesty.  The panel also found respondent's conduct harmful to the reputation of the legal profession.

¶ 17.    Based on these factors, the panel concluded that a reprimand was the presumptive sanction under ABA Standard § 5.13.  That standard provides that a "[r]eprimand is generally appropriate when a lawyer knowingly engages in . . . conduct [other than that specified in §§ 5.11 and 5.12] that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."  Id.  The panel found a public reprimand consistent with other cases where a lawyer's dishonesty was aimed at a law firm and no financial harm resulted.

¶ 18.    The panel then considered aggravating and mitigating factors.  It found that respondent acted selfishly to maximize her own personal financial interest in her spouse's recovery.  It also found that respondent acted at least in part to advance her client's interests, even though her actions were wrongful.  Given the presence of "mixed motives," the panel did not assign significant weight to this factor.  As an additional aggravating factor, the panel found that respondent had substantial experience in the practice of law.  The sole mitigating factor was the absence of a prior disciplinary record.  On balance, the panel concluded that the aggravating factors did not substantially outweigh the aggravating factors and it did not adjust the presumptive sanction.  Finally, the panel considered other disciplinary decisions and found the imposition of a public reprimand consistent with those cases.  It thus recommended that respondent be publicly reprimanded for violating Rule 8.4(c).

¶ 19.    On appeal, Disciplinary Counsel asks us to adopt the panel's findings and conclusions but modify the sanction to impose a thirty-day suspension.  She argues that, in addition to violating a duty to the profession and the general public, respondent also violated a duty to her

6

client and caused her client potential harm. Based on this argument, Disciplinary Counsel asserts that the presumptive sanction is a suspension rather than a public reprimand.

¶ 20. Respondent argues that her conduct does not violate Rule 8.4(c). She cites her own testimony in support of her position and provides a version of events that is largely divorced from the panel's findings. Assuming she did violate Rule 8.4(c), respondent contends that an admonition is appropriate.

¶ 21. We review the panel's factual findings for clear error and will uphold those findings "if clearly and reasonably supported by the evidence, whether the findings are purely factual or mixed law and fact." Robinson, 2019 VT 8, ¶ 19 (quotation omitted). We "review de novo [the panel's] conclusions of law, including [its] violation determinations and sanction recommendations." Id. ¶ 27. As set forth below, we find no basis to disturb the panel's findings and we agree with its conclusion that respondent violated Rule 8.4(c). While we agree with the panel that a reprimand is the presumptive sanction, we conclude that the aggravating factors warrant an increase in the sanction to a fifteen-day suspension.

¶ 22. At the outset, respondent fails to show, or even argue, that any of the panel's factual findings are clearly erroneous. She simply provides her own version of events. In evaluating whether respondent violated Rule 8.4(c) and in considering the appropriate sanction, we rely solely on the panel's unchallenged findings and not respondent's allegations.

¶ 23. As set forth above, it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." V.R.Pr.C. 8.4(c). To be sanctionable, the conduct must bear on the attorney's "fitness to practice law." In re PRB Docket No. 2007-046, 2009 VT 115, ¶¶ 9, 12, 187 Vt. 35, 989 A.2d 523 (recognizing that rule does not encompass "any dishonesty, such as giving a false reason for breaking a dinner engagement"); see also E. Bennett, et al., Ann. Model Rules of Professional Conduct § 8.4 cmt. 2 (9th ed.) (Am. Bar Ass'n

2019) ("[A] lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice.").

¶ 24.    The term "dishonesty" means, among other things, "conduct evincing a lack of honesty, probity or integrity in principle" and "a lack of fairness and straightforwardness." In re Shorter, 570 A.2d 760, 768 (D.C. 1990) (quotation omitted); see also In re Herman, 348 P.3d 1125, 1132 (Or. 2015) ("[D]ishonesty includes a disposition to lie, cheat, or defraud; and a lack of trustworthiness or integrity."). "Deceit" has been described as including "the suppression of a fact by one who is bound to disclose it." Shorter, 570 A.2d at 767 n.12 (quotation and alteration omitted); see also Att'y Grievance Comm'n of Md. v. Floyd, 929 A.2d 61, 66 (Md. 2007) ("[T]he law recognizes that deceit can be based on concealment of material facts as well as on overt misrepresentations.").

¶ 25.    We recognized this form of deceit in In re Strouse, 2011 VT 77, ¶¶ 14, 18, 190 Vt. 170, 34 A.3d 329, where we concluded that an attorney had a duty to disclose to her firm that she had resumed a romantic relationship with the husband of the firm's client, which created an ethical dilemma for the firm, and that her failure to do so was deceitful and reflected adversely on her fitness to practice law. We explained there that a duty to speak may "arise from the relations of the parties, or superior knowledge, or means of knowledge." Id. ¶ 15.

¶ 26.    Applying these standards, we agree with the panel that respondent violated Rule 8.4(c). As set forth above, the record shows that respondent was aware that the firm claimed an interest in a portion of the settlement proceeds and she nonetheless took the settlement check from the firm and deleted case-related material from the firm's computer system. She told no one of her actions until confronted by the managing partner several weeks later. Respondent had a duty to be forthright with her colleagues and she failed to disclose material facts with an intent to mislead. See Strouse, 2011 VT 77, ¶ 15 (recognizing that this type of conduct constitutes deceit); see also Herman, 348 P.3d at 1132 (concluding that although "no rule explicitly requires lawyers

8

to be candid and fair with their business associates or employers, such an obligation is implicit in the prohibitions" contained in Oregon's equivalent to Rule 8.4(c)).

¶ 27. Respondent's dishonest and deceitful actions toward members of her firm, intended in large part to maximize her own financial interests at the firm's expense, necessarily calls "into question [her] fitness to practice law." PRB Docket No. 2007-046, 2009 VT 115, ¶ 9; see Fla. Bar v. Kossow, 912 So. 2d 544, 548 (Fla. 2005) ("An attorney who uses firm resources to place his or her pecuniary interests over those of the firm engages in misconduct that indubitably calls into question the attorney's fitness to practice law . . . ."). Her conduct breached the "total trust and confidence" that is the foundation of "[m]ost law partnerships." Iowa Sup. Ct. Bd. of Prof'l Ethics & Conduct v. Huisinga, 642 N.W.2d 283, 287 (Iowa 2002) (explaining that "[a]n attorney cannot resort to self-help to rectify what may be perceived to be an inequity in the division of law partnership earnings"(quotation omitted)). Her "breach of this exceedingly close relationship merits disciplinary action." Id.; see also Bennett, supra, § 8.4 (recognizing that "[s]tealing from one's own law firm violates Rule 8.4(c)" and "[o]ther forms of dishonesty to a lawyer's own firm, colleagues, supervisors, or employees can also violate the rule" (citing cases)).

¶ 28. We note that the panel rejected as not credible respondent's assertion that she had to behave as she did to protect her client's interests in the settlement proceeds. The panel found that no reasonable attorney would believe this to be true and that, rather than acting in her client's interests, respondent acted with an intent to conceal and to advance her own financial interest as her client's spouse. Cf. PRB Docket No. 2007-046, 2009 VT 115, ¶ 17 (finding no violation of Rule 8.4(c) because attorneys who surreptitiously tape-recorded phone conversation with witness "earnestly believed that their actions were necessary and proper" in the course of representing client in criminal case).

¶ 29. In reaching our conclusion, we reject respondent's characterization of her conduct as essentially limited to a single act of deleting an electronic file. That assertion is belied by the

9

record set forth above. Respondent also argues that her conduct is not as egregious as in other cases where violations of Rule 8.4(c) or its equivalent have been found. The fact that attorneys in other disciplinary cases may have engaged in more egregious and longstanding dishonesty or deceit than respondent does not make her own behavior any less dishonest or deceitful, and it does not weigh against a finding that she violated Rule 8.4(c).

¶ 30. As she did below, respondent offers various justifications for her behavior. She blames the firm for failing to approach her to discuss the settlement check until a month after the case settled. She claims credit for not lying to the managing partner when he confronted her about the missing check and she cites the absence of any evidence that she instructed staff members to hide the check or lie about its location. According to respondent, she was entitled to delete the electronic copy of the check because there was no fee agreement with the firm, the check was made out to her spouse, and "the check had been delivered to [her] desk," leading her to reasonably believe that the partners had agreed that she should provide the check directly to her spouse.

¶ 31. We reject these arguments for the same reasons as the panel did below. Respondent is responsible for any delay in discussing the fee issue. The firm had communicated to respondent as of the date of the mediation that it expected one-third of the settlement as its fee. Respondent was informed that if she had an alternative proposal, she should propose it to the partners. She failed to do so. Instead, when the settlement check arrived, she asked her administrative assistant to place it on her desk, she took the check home that evening, and the following day, she deleted the electronic evidence documenting the check's arrival. Respondent did not disclose the check's arrival to the partners, nor did she inform the partners that she took the check home and deleted files related to the check. Respondent's decision not to engage in additional deceit upon being confronted by the managing partner, and her assertion that she did not direct anyone else to lie on her behalf, in no way justifies or minimizes the conduct described above.

¶ 32.    Respondent's focus on the absence of a fee agreement is equally unavailing.  As the panel explained, respondent included her spouse's case when she disclosed her pending cases to the firm, and it was fair to imply from her statement about the strength of her wife's case that there was a potential recovery for the firm if respondent continued handling the case.  During mediation, respondent initiated communication with the partners about paying the firm's fee despite the absence of a fee agreement.  She never told the partners that they had no right to pursue a share of the funds.  On the contrary, she expressed her belief that an $8000 payment to the firm would be reasonable.  The absence of a fee agreement under the circumstances of this case neither justifies nor excuses respondent's conduct.

¶ 33.    Nor does the absence of a fee agreement lend any support for respondent's assertion that she had the right to delete records from the firm's database and deliver the check to her spouse, all of which she did surreptitiously.  The panel found that respondent's spouse was a client of the firm.  For professional responsibility reasons and to protect against malpractice claims, all work-related documents at the law firm was preserved.  No reasonable person would believe under the circumstances set forth above that because respondent's assistant put the check on respondent's desk at respondent's request, the firm had waived its interest in a fee and respondent was entitled to treat this as a "personal" matter for which no documentation or disclosure was required.  We credit the panel's conclusion that respondent's after-the-fact rationalizations are not credible.

¶ 34.    Having found that respondent violated Rule 8.4(c), we turn to the appropriate sanction.  Like the panel, we weigh: (1) the duty violated; (2) respondent's mental state; (3) the actual or potential injury caused by her misconduct; and (4) the presence of aggravating or mitigating factors.  ABA Standard § 3.0; see also Robinson, 2019 VT 8, ¶ 33.  "Depending on the importance of the duty violated, the level of the attorney's culpability, and the extent of the harm caused, the standards provide a presumptive sanction."  Strouse, 2011 VT 77, ¶ 19.  "The presumptive sanction can then be tailored to the case, based on the existence of aggravating or

mitigating factors." Id. "[T]he sanctions are intended to leave room for flexibility and creativity in assigning sanctions in particular cases." Id. ¶ 26 (quotation omitted); see also ABA Standards, Theoretical Framework (recognizing that "standards are not designed to propose a specific sanction for each of the myriad of fact patters in cases of lawyer misconduct," but instead to "provide a theoretical framework to guide the courts in imposing sanctions"). We rely on the ABA Standards as "a helpful guide in assigning an appropriate sanction," but they "are not binding on this Court." Robinson, 2019 VT 8, ¶ 40.

¶ 35. First, we agree with the panel that respondent owed duties to the public and the legal profession to refrain from engaging in dishonest and deceitful conduct and that she violated those duties here. See ABA Standards, Theoretical Framework ("The community expects lawyers to exhibit the highest standards of honesty and integrity, and lawyers have a duty not to engage in conduct involving dishonesty, fraud, or interference with the administration of justice."). We are not persuaded by Disciplinary Counsel's argument that respondent also violated duties owed to her client. The ABA Standards describe the duties that lawyers owes to their clients as including the duties of loyalty, diligence, competence, and candor. Id. The facts as found do not implicate those duties here.

¶ 36. With respect to respondent's mental state, we agree with the panel that respondent acted with intent, "the most culpable mental state." Id. As reflected in the ABA Standards, a lawyer's mental state is one of intent "when the lawyer acts with the conscious objective or purpose to accomplish a particular result." ABA Standards, § 3.0, cmt. Respondent here intentionally removed the settlement check from the office and deleted the electronic copy of the check without notifying the partners that she was doing so with the intent to conceal the existence of the check from the partners and prevent them from holding the check or some portion of the proceeds pending resolution of the fee dispute.

12

¶ 37. There is no support for respondent's assertion that she acted negligently. Her disclosure to J.S. that the case had settled and her decision not to lie when confronted about the missing check do not demonstrate an absence of intent. As previously discussed, the panel acted within its discretion in rejecting respondent's assertion that she thought it was permissible to delete files.

¶ 38. Turning to injury, the panel correctly concluded that the firm was injured through the damaged relationship of trust and honesty essential to the operation of every law firm. See Huisinga, 642 N.W.2d at 287. The way in which respondent treated the settlement funds was "a betrayal of the fundamental trust by which . . . lawyers . . . are bound and upon which [lawyers] must rely in our professional associations with one another." Id. at 288. Additionally, by engaging in dishonest and deceitful conduct, she necessarily harmed the reputation of the legal profession.

¶ 39. Unlike the panel, we conclude that the firm may have been financially harmed by respondent's conduct. The firm asserted an interest in the settlement proceeds as a fee for respondent's—its employee's—services. The firm's decision not to pursue its interest in the settlement does not negate its potential financial loss. We reject the argument that, simply because the firm might not have prevailed in a claim against respondent's wife to recover fees for its services, we should therefore discount the potential financial harm in this case. This would reward respondent for her dishonest conduct. As the ABA Standards recognize, "[t]he fact that one injured person is willing to forgive and forget should not relieve or excuse the lawyer, who then has the capability of injuring others." ABA Standards § 9.4 cmt. (citing cases). "The disciplinary system is designed to protect all members of the public." Id.; see also Robinson, 2019 VT 8, ¶ 73 (recognizing that sanctions serve "to protect the public from persons unfit to serve as attorneys and to maintain public confidence in the bar, as well as to deter other attorneys from engaging in misconduct" (quotation omitted)).

¶ 40.    Based on our analysis of these factors, we conclude that Standard 5 is the best fit here.  This standard addresses the violations of duties owed to the public.  It recognizes that "[t]he most fundamental duty which a lawyer owes the public is the duty to maintain the standards of personal integrity upon which the community relies.  The public expects the lawyer to be honest and to abide by the law . . . ."  ABA Standards § 5.0, intro.

¶ 41.    Standard 5.0 contains a range of presumptive sanctions, depending on how seriously the conduct reflects on the lawyer's fitness to practice; it does not, however, provide an option "between reprimand and disbarment, such as suspension."  Strouse, 2011 VT 77, ¶ 24.  "The sanction to be applied, therefore, be it disbarment, reprimand, or something in between, requires an exercise of judgment."  Id.

¶ 42.    Standard 5.13 provides that a "[r]eprimand is generally appropriate when a lawyer knowingly engages in any other conduct [besides criminal conduct] that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law."  We find this standard most applicable as respondent intentionally engaged in conduct that involved dishonesty and deceit but she was not found to have engaged in criminal conduct.

¶ 43.    We find no support for respondent's contention that an admonition is the presumptive sanction.  Her argument rests on a premise, which we have rejected, that she did not engage in deceitful conduct and that the firm suffered no financial harm from her conduct.

¶ 44.    We are also unpersuaded by Disciplinary Counsel's argument that Standard 4.0 or Standard 7.0 should apply.  Standard 4.0 addresses violations of duties owed to clients, which is not at issue here.

¶ 45.    "Standard 7.0 provides a nonexclusive list of cases in which the Standard 7.0 sanctions are generally appropriate," none of which are particularly applicable here.  Robinson, 2019 VT 8, ¶ 47 n.7 (quotation omitted).  We declined to apply Standard 7.0 in Strouse, which similarly involved a violation of Rule 8.4(c) through deceit, because the conduct described in the

introduction to this standard did not "match[] respondent's conduct" and another standard, Standard 5.13, "clearly appl[ied]." 2011 VT 77, ¶¶ 22, 24. We reach a similar conclusion here.

¶ 46. We did apply Standard 7.0 in Robinson, 2019 VT 8, ¶ 47 n.7, concluding that "unlike Strouse, there [was] not another 'clearly applicable' standard for [the] respondent's grossly deceitful conduct toward a vulnerable and unrepresented individual, which resulted in serious potential injury to [that individual]." We recognized there that the commentary accompanying Standard 7.0 indicated that it was "applicable in situations involving 'falsehoods and omissions,' " and we determined that "whether the respondent's conduct was expressly included in the Standard 7.0 categories [was] not dispositive." Id.

¶ 47. Other courts have applied this standard in cases involving an attorney's deceit and dishonesty toward his or her law firm. See, e.g., Kossow, 912 So. 2d at 547-48 (imposing thirty-day sanction for attorney's unethical and dishonest dealings with his firm and finding conclusion consistent with Florida equivalent of Standard 7.2); In re Schwartz, 599 S.E.2d 184, 184 (Ga. 2004) (per curiam) (citing language of Standard 7.2 in suspending attorney for accessing, listening to, and randomly deleting voicemail messages on voicemail system of his former law firm). We note that our ultimate conclusion that respondent should be suspended is consistent with Standard 7.2, which provides that "[s]uspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty as a professional, and causes injury or potential injury to a client, the public, or the legal system." Ultimately, while we do not find Standard 7.0 totally inapposite, we conclude that Standard 5.0 is a better fit for this particular fact pattern.

¶ 48. We thus turn to the aggravating and mitigating circumstances. See ABA Standards §§ 9.1, 9.21, 9.31 (recognizing that aggravating or mitigating circumstances may warrant increase or decrease in degree of discipline to be imposed). As the panel found, respondent acted with a dishonest and selfish motive. We do not diminish the gravity of this aggravating circumstance simply because respondent's wrongful conduct ultimately served her client's financial interests as

15

well as her own. The panel found that respondent did not need to engage in this misconduct to protect her client's interests.* Essentially, her conduct was self-serving. Unlike the panel, we give this factor significant weight.

¶ 49. The panel also overlooked respondent's refusal to acknowledge the wrongful nature of her conduct, an additional aggravating factor under Standard 9.2. Respondent took the position below that the law firm was to blame and that her behavior was appropriate; she offered justifications for her actions that the panel rejected as not credible. She expressed no remorse for her misconduct. As an additional aggravating factor, respondent has substantial experience in the practice of law. The only mitigating factor is the absence of any prior disciplinary violation. On balance, the aggravating factors far outweigh the only mitigating factor, which justifies increasing the sanction to a fifteen-day suspension.

¶ 50. "In the past, we have looked to sanctions imposed in other cases to aid us in measuring out a sanction." Robinson, 2019 VT 8, ¶ 74. We also recognize, however, "that meaningful comparisons of attorney sanction cases [can be] difficult as the behavior that leads to sanction varies so widely between cases." Id. (quotation omitted).

¶ 51. We found a reprimand appropriate in Strouse, where an attorney violated Rule 8.4(c) by failing to disclose to her firm that she was having an ongoing romantic relationship with the husband of the firm's client. 2011 VT 77, ¶ 35. In that case, "the conduct at issue was not related directly to the handling of client matters or funds." Id. ¶ 27. While the attorney acted selfishly, we found her behavior "mitigated . . . by the fact that she acted not for greed or glory, nor for malice or lucre, but apparently for romantic reasons." Id. ¶ 34. We also cited the attorney's

---

* We note an inconsistency in the panel's findings on this point. As indicated, the panel rejected as not credible respondent's assertion that she had to act as she did to protect her client's interests in the settlement proceeds. At the same time, it found that respondent was acting at least in part to advance her client's interests in resisting the firm's request for a payment. We give no weight to this latter finding because it in no way diminishes respondent's dishonest and selfish motive.

"relatively brief professional experience and her lack of other disciplinary actions" to support "the more lenient sanction of a public reprimand." Id. ¶ 35. Although the attorney's deceit "harmed her firm and the client" and "briefly exposed the firm to a potential ethical violation," she was swiftly fired, and the potential for an ethical violation "was soon extinguished." Id. ¶ 36. "There was no actual injury to the public." Id. We determined that the conduct was not egregious enough to warrant a suspension. Id. ¶ 29 (discussing more egregious cases where suspension was imposed).

¶ 52. We are faced with different circumstances here. In this case, respondent acted selfishly to maximize the financial recovery for her wife, and derivatively, herself, at the expense of the firm. She was hired with the understanding that her wife's case was likely to bring income to the firm, she used firm resources in working on the case, she suggested that the firm deserved a share of the settlement proceeds, and she knew that the firm in fact claimed a one-third share of the settlement proceeds. She nonetheless hid the check from the firm when it arrived and deleted electronic evidence of its arrival, apparently hoping that the firm would not pursue its requested fee. Unlike the attorney in Strouse, moreover, respondent had extensive experience in the practice of law. She also inflicted potential financial and other harm on the firm, the public, and the legal profession. All of these factors distinguish this case from Strouse and warrant a more severe sanction than was imposed there.

¶ 53. We further emphasize that the attorney in Strouse was deceitful about something in her personal life, which resulted in no actual injury to the public. Id. ¶ 36. Respondent's deceit and dishonesty, by contrast, is directly related to the practice of law, it resulted in injury to the public, and it demonstrates a "disregard for values that are most fundamental in the legal profession." In re Lamberis, 443 N.E.2d 549, 551-52 (Ill. 1982) (recognizing that "[h]onesty is . . . fundamental to the functioning of the legal profession"). As one court explained:

17

> It is vital to the well-being of society that an attorney, who is an officer of the court and a part of our judicial system, should maintain the most scrupulous care in conducting [the attorney's] professional and business affairs. The public as well as [the attorney's] clients and the courts have an interest in his integrity and are entitled to require that [the attorney] shun even the appearance of any fraudulent design or purpose.

In re Abbamonto, 166 N.E.2d 62, 64 (Ill. 1960) (citation omitted).

¶ 54. This basic principle is echoed in other cases. In Herman, the Oregon Supreme Court concluded that disbarment was the appropriate sanction for an attorney who engaged in dishonest conduct and misrepresentation that reflected adversely on his ability to practice law. 348 P.3d at 1135-36. The attorney there dishonestly and deceitfully diverted funds and assets belonging to one corporation (of which he was a member) to another company that he controlled, breaching his duty to the directors of the first company and violating their trust.

¶ 55. The Oregon Supreme Court reviewed its existing case law and discussed in detail an attorney's "implicit obligation to be candid and fair with his [or her] employers, as well as the duty of loyalty arising out of the employment relationship between the lawyer and the firm." Id. at 1135. It "emphasized the need to maintain the public's confidence in the legal profession," explaining:

> No one who is admitted into the legal profession may be permitted to sully or destroy the right and need of the public to impose absolute confidence in the integrity of a lawyer. Literally thousands of personal and business transactions of unknowing people must be and are entrusted to the hands of some lawyer. Money, property and matters of personal confidence are daily entrusted to the integrity of the individual lawyer. In almost all such instances no bond or security, other than integrity, is required to assure the protection or performance of the trust. No member of the Bar need consider long wherein his [or her] duty lies. True, the rules of professional conduct may fill many pages; the opinions interpreting some of the rules, many volumes. But in the more basic conduct [the attorney] is called upon to perform, any lawyer knows the simple rules that he [or she] must cling to: Simple straightforward honesty and absolute good faith. No less will suffice.

18

Id. at 1134-35 (quotation omitted). In a previous case, the court had found the "violation of the fiduciary duty to partnership funds" to be "no less abhorrent" than similar violations with respect to client funds. Id. (quotation omitted).

¶ 56. In Kossow, the Florida Supreme Court found that an attorney engaged in disloyal and deceitful conduct towards his firm. 912 So. 2d 544. Despite the firm's prohibition against providing legal services in any capacity other than as employees of the firm, the attorney represented outside clients and kept the fees for himself. He lied to the firm about doing so. Although the attorney used firm resources and billable time in engaging in this outside work, the firm did not demand a portion of the fees or the return of any money.

¶ 57. The court found that the attorney's misconduct constituted a serious breach of loyalty to his firm. It rejected the referee's recommended discipline of a reprimand and instead imposed a thirty-day suspension. The court found "that a public reprimand [was] too lenient for what was blatantly dishonest and deceitful conduct on [the attorney's] part." Id. at 546. Its decision was based in part on the fact that the attorney "furthered his own financial goals at the firm's expense." Id. The court found it "unquestionable that by using the firm's equipment, materials, and time (during which [he] could have been working for the firm, or the associates who discussed [his] cases with him could have been doing work for the firm), [he] misappropriated the resources of the firm that employed him, thereby compromising the good of the firm to his own financial ends." Id.

¶ 58. While these cases involve more egregious conduct than that at issue here, the same fundamental values are at stake. As the panel emphasized here, respondent had a duty to be transparent and forthcoming in dealing with her colleagues, particularly given that her own financial interest as the client's spouse conflicted with the firm's interest. She instead chose to act surreptitiously and further her own financial interests at the expense of the firm, violating her fundamental obligations to be forthright, loyal, and honest with her colleagues. Given the

19

seriousness of the duties violated, the harm inflicted on the public and the profession, and the various aggravating factors, a fifteen-day suspension is warranted.

¶ 59. Respondent's suspension will be effective thirty days from the date this decision is issued. This will allow her to close out her practice and protect the interests of her existing clients. Respondent is directed not to accept any new clients from the date that this opinion is issued until her suspension is completed. See id. at 548 (taking similar approach to implementation of thirty-day suspension).

Respondent is suspended from the practice of law for fifteen days; her suspension will begin thirty days from the date that the mandate executes under V.R.A.P. 41.

BY THE COURT:

_____
Paul L. Reiber, Chief Justice


_____
Beth Robinson, Associate Justice


_____
Karen R. Carroll, Associate Justice


_____
Marilyn S. Skoglund, Associate Justice (Ret.),
Specially Assigned


_____
Dennis R. Pearson, Superior Judge,
Specially Assigned

20